(Decided June 28th, 1866.)

THE BALTIMORE MARINE INSURANCE COMPANY *vs.* WILLIAM F. DALRYMPLE; AND, WILLIAM F. DALRYMPLE *vs.* THE BALTIMORE MARINE INSURANCE COMPANY.—CROSS-APPEALS.

CONTRACT,—CONSTRUCTION OF: BAILMENT: PLEDGOR AND PLEDGEE: SALES BY PLEDGOR TO THIRD PARTIES AND TO SELF: PLEADING: TROVER AND CASE: TORTIOUS CONVERSION: ELECTION.—W. F. D. sued the Insurance Company to recover damages for the alleged conversion, to its own use, of certain shares of stocks and bonds which the plaintiff had pledged to the defendant to secure the re-payment of money lent to him by the defendant. The first declaration filed was in *trover*, which was amended by adding certain counts *in tort* as in the preceding case. The same agreement was filed as to the pleadings. The terms of the pledge, as evidenced by written contracts were also similar to those in the preceding case, binding the plaintiff to repay the loans, some on one and some on three day's notice; and in case of default authorized the defendant, without further notice, to sell the pledges for the payment of the same. Some of the stocks and bonds were pledged as "margins" or

further security on the general loans, and on a portion of them an additional loan was made—no express stipulation being made as to these further pledges. In November, 1865, due notice, according to the contracts, was given to the plaintiff to repay the money lent, and upon his default the defendant sold the stocks and securities pledged, publicly at the Board of Brokers in Baltimore,—all of them except certain shares of the Baltimore and Ohio R. R. Stock, to third parties, after express notice of such intended sales to the plaintiff. The stocks above excepted were bought by the defendant through the agency of a broker,—HELD:

1st. As to the sales of the collaterals to third persons: that these sales, not being impeached on the ground of fraud or unfairness, were legal and valid, and in respect to them the plaintiff cannot maintain the present suit.

2nd. As to the sale by the pledgee to itself: that such sale, in the absence of consent or acquiescence on the part of the pledgor, was, both at law and in equity, illegal and ineffectual to pass the absolute title to the pledgee as purchaser; that it did not operate as a conversion of the property so as to break up the bailment, except at the election of the pledgor; and in the absence of such election, the bailment continued in the same manner as if such attempted sale had not been made.

3rd. That the securities "put up as a margin," were pledged according to the terms of the written contracts relating to the original pledges,—the rule being, that the accretion follows the main body, and is subject to the same conditions.

——: ——: ——: ——: NOTICE: SALES OF STOCK AT BROKERS BOARDS, AND AT PRIVATE SALE: TORTIOUS CONVERSION: ELECTION: DAMAGES, MEASURE OF, IN TROVER AND CASE: RECOUPEMENT: GENERAL LIEN.—— After the sale of the stock of the Balto. & Ohio R. R. Co., and the purchase of the same by the defendant, the said stock was sold by it to a third party at private sale, and immediately thereafter the plaintiff was informed of such sale. On the 17th day of December, 1862, the plaintiff tendered to the defendant the amount of the loans with interest, and demanded a return of all the stock and collaterals pledged, which tender and demand were refused. It was in evidence that the stock of the Baltimore and Ohio Rail Road Company fluctuated in value between November, 1860, and December, 1862, from $77 to $40 per share; that there were dividends on the said stock on the 27th of October, 1860, the 15th of April, 1861, the 28th of May and the 30th of September, 1862; and that on a portion of said securities, viz: "Extra Dividend Bonds," interest was paid to June 1st, 1862.—HELD:

1st. That the attempted sale and purchase by the defendant, at the Brokers'

Board, was inoperative; that the possession of the stock remaining unchanged, the bailment continued thereafter as before; but notice having been given under the contract, and the plaintiff being in default, the power to sell continued, and if it had been legally exercised no action of *tort* could be maintained.

2nd. That the defendant had not the legal right to dispose of the stock at private sale; that the sale so made, on the 21st of November, 1860, was, therefore, contrary to the duty of the defendant as pledgee, and in law tortious, for which the plaintiff is entitled to maintain his action either in *trover* or in *case*.

3rd. That an instruction, that the jury might, in their discretion, assess the value of the stocks at their highest market value, on the day of trial, or on any other day before that time, and after the day of the demand and refusal, was erroneous.

4th. That an instruction to the jury, "that in estimating the damages they were bound to give to the plaintiff what they might find, from the evidence, to have been the market value of the seven hundred and seventy shares of stock, on the 17th of December, 1862, with interest thereon, deducting therefrom the sum loaned and interest," was also erroneous.

5th. That the *tort* complained of, and which is the ground-work of this action, was the sale and transfer of the stock to D., on the 21st of November, 1860, and not the refusal to accept the tender and to comply with the demand for the return of the stock; to treat the latter as the tortious act would not only be contrary to reason, but in direct opposition to the well settled principles of the law.

6th. That the tortious act of the defendant, being in the breach of the legal duty arising out of the contract, the damages should be compensatory merely.

7th. That the demand and refusal in this case could have no effect, either in giving to the plaintiff a right of action, or to fix the measure of damages.

8th. Treating this case as an action of *trover*, the general rule is well established, that the proper measure of damages is the actual value of the stock at the time of the conversion, deducting, of course, the amount of the debt due the defendant by way of recoupment; and if it be treated as a special action in *case*, the change in the form of the declaration cannot alter the rule of damages.

9th. That there may be special circumstances which will take a case out of the operation of the general rule, and entitle a party to recover in *trover* or *case* more than the value of the property at the time of the

conversion; but in this case there are no such facts or circumstances which, either in law or justice, entitle the plaintiff to claim more than compensation for the injury actually suffered by him at the time the *tort* was committed.

10th. That it is clear, that in ascertaining the damages, the amount of the debt due the defendant, to secure which the stock and other collaterals were pledged, ought to be deducted; and that such mode of ascertainment is consistent with the general doctrine of *recoupement* established in modern cases, and recognized by this Court in several cases.

11th. That in a case like the present, the application of this doctrine does not rest upon the principle of lien.

CROSS-APPEALS from the Superior Court of Baltimore city.

This suit was brought by Dalrymple against the Baltimore Marine Insurance Company. There was filed in the case a declaration in *trover* for the conversion, by the defendant, to its own use, of seven hundred and seventy shares of the capital stock of the Baltimore and Ohio Rail Road Company, one thousand one hundred shares of the stock of the Northern Central Rail Road Company, five bonds of the Baltimore and Ohio Rail Road Company, each for the payment of $1,000, with interest, and ten bonds of the same Company, each for the sum of $500, with interest. To this declaration there was a plea of *not guilty*, and issue joined on this plea. A jury was sworn, and after a trial of some days, and upon the motion of the plaintiff, a juror was withdrawn, and the case continued. Subsequently an agreement was made, "that, in lieu of formal pleadings, the plaintiff shall be considered as having amended his declaration by adding such other counts *in tort* as the state of the facts, as they appear at the trial, may justify, and that defendant shall be considered as having filed such pleas as the state of the facts, as they appear at the trial, may justify, and that replication shall be considered as having been filed to such pleas, and issues thereupon joined;" and with this agreement, the case was to be "tried upon the pleadings as they

then stood, all errors in pleadings on both sides released, with leave to each party to give the special matter in evidence." The same benefit of appeal is given as if formal pleadings had been put in.

The verdict of the jury and judgment were for the plaintiff. Both parties excepted to the rulings of the Court below, (MARTIN, J.,) upon the prayers respectively submitted by them, and to the instruction given by the Court, and both parties appealed.

For a full statement of the facts of the case, see the opinion of this Court.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH, COCHRAN and WEISEL, J.

*I. Nevitt Steele* and *Wm. S. Waters,* for the Baltimore Marine Insurance company:

First. The appeal by plaintiff. The questions upon the appeal by the plaintiff grow out of the rejection of prayers presented by him, and the granting of the ninth prayer of the defendant.

1st. His first prayer was rejected. This prayer is based upon the sale of the 1,000 shares of the Northern Central Rail Road stock, pledged for the loan of $17,000. The Court was asked to say that the sale of this stock was illegal, because no sufficient notice was given under the contract. Although payment or additional security was demanded, no time was named for payment, and no specific amount or value of additional security was named. When the loan was demanded, according to this contract, it became payable one day thereafter, and no further notice of the sale was required. The demand was not rendered ineffective by proposing to take additional security instead of the money. This was in mitigation of the pledgee's right, and in mercy to the pledg-

or. No notice was required as to additional security. As to that, the pledgor contracted absolutely. The written agreement governs the case, and its true meaning is, that all notice is waived, and the pawnee is only held to a sound discretion. *Wheeler vs. Newbold*, 16 *N. Y.*, 401. *Story on Bailments*, 317. *Lawrence vs. Farmer's Loan and Trust Co.*, 3 *Ker.*, 201.

2nd. The second prayer of the plaintiff was rejected. This is in relation to the one hundred shares of the Northern Central Rail Road stock, pledged as margin or additional security. The Court was requested to say, that in order to warrant the sale of this stock, there must have been an express authority to sell this stock, without further notice, (as in the written contracts;) or the jury must find reasonable notice. The prayer was properly rejected. The one hundred shares, put up as margin, was of course pledged according to the terms of the written contracts. This is the meaning of the language of the contract, and the general rule is that the accretion follows the main body, and is subject to all its conditions.

3rd. The third prayer of the plaintiff was granted with an addition thereto, and there is no exception, on the part of plaintiff, to such modification of the prayer.

4th. The plaintiff's sixth prayer was rejected. It proposes to give to the jury a discretion in regard to damages, allowing them to give the highest market value of the stock, on or before the day of trial. The question involved in this prayer will be considered hereafter with the question of the proper measure of damages, and it is contended that the prayer was properly rejected for the reasons hereafter to be given.

5th. The eighth prayer of the plaintiff was rejected. This prayer denies to the defendant the right of recoupement. The rejection of this prayer was right. *Chinery vs. Viall*,

5 *Hurl. & Nor.,* 288. *Story on Bailments,* 315. *Johnson vs. Stear,* 3 *Am. Law Reg.,* ( *N. S.,*) 753. *Abbott vs. Gatch,* 13 *Md. Rep.,* 332.

6th. The ninth prayer of the plaintiff was rejected. It requires the defendants to account for dividends on the Baltimore and Ohio Rail Road stock, which accrued after the sale. These dividends were never received by the defendants, and could not have been received. The stock itself was not in their possession, or under their control, when such dividends were collectable. Upon no principle of the law of bailments could they then be considered as bound for them. The principle applicable to this question will be considered in connection with the question of the measure of damages.

The only prayer of the defendant granted was the ninth. It is as follows: If the jury find from the evidence, that the one hundred shares of this railroad stock, and the $5,000 of Ohio Railroad bonds were put up by the plaintiff as a margin on the previous indebtedness and pledge of stock of the plaintiff to the defendant, as offered in evidence, with the stipulation, that a further advance of $4,000 should be made by the defendant, and that said $4,000, it was agreed by the parties, should be combined with, and form part of, the said general indebtedness, then the defendant had the right to sell said bonds upon the longest term of notice, stipulated in the written agreements, offered in evidence as to the previous existing loans and pledges constituting said general indebtedness in the terms thereof. The same subject is embraced in the second prayer of the plaintiff. ( See "2nd" above.)

Second. The appeal of the defendant. This embraces the granting of the third prayer of the plaintiff, with modification, and the rejection of all the prayers of the defendant, except the ninth.

1st. The granting of the third prayer of the plaintiff as

modified: The court, by this instruction, gives the rule of damages governing this case, and the reasons for it, viz: that the refusal to deliver the seven hundred and seventy shares of the Baltimore and Ohio Rail Road stock, upon the tender and demand, gave a cause of action upon which the defendant is entitled to recover under the pleadings and agreement in this cause. The prayer assumes that the sale of this stock, at the Stock Board, by the defendant, through their agents, and the purchase of the same, through their agents, was a nullity. That is to say, that the relationship of pledgor and pledgee was not changed thereby but remained as before. The effect of the subsequent sale to Denison, in the opinion of the Court below, can only be inferred. Is it a nullity? Does the relation of pledgor and pledgee remain after as before it? Or are those broken up and ended by it? If either of the sales were legal no action can be sustained. For the purpose of the immediate question involved in this prayer, it will be conceded that both were illegal. Yet, by the operation of the last sale, the property completely passed from the possession and control of the defendant.

In view of that state of the case, the following propositions, illustrating the effect upon the relations of the parties, are true:

1st. The contract of bailment, in its very essence, requires that the subject matter of it be some *specific thing* known as having been, and still being the property of the bailor. The bailee holds the possession, and has such qualified property as the nature of the contract imposes, but the bailor still retains the general property. The particular bailment here involved is that of a pledge; a specific article identified and described is the subject of it. *Johnson vs. Stear*, 3 *Am. Law Reg.*, ( *N. S.*,) 760. *Dykers vs. Allen*, 7 *Hill*, 497. *Wilson vs. Little*, 2 *Com.*, 448. *Jones on Bail.*, 36 & 117. *Story on Bail.*, §§ 286, 287, 288, 290, 294, 297, 299.

2nd. The contract, on the part of the pledgor, could not

be met, upon a tender and demand, by returning other stock of a like kind. The duty is imposed upon the pledgee to *keep* the identical property, and the relation of pledgor and pledgee could only last while the property was so *kept.* This was the essential element of the relation. If the defendant could have satisfied a demand of the property, upon tender of the loan, by returning property of a like kind, the sale of property to Denison would not be a wrong or a violation of the contract. A contract for the delivery of stock upon a loan, and upon a tender of the loan to pay stock of a like kind, is not a bailment or pledge ; it is a contract special in its character, and the implied power to dispose of the stock advanced at any time is unquestionable. See *Dykers vs. Allen,* 7 *Hill,* 497, and other authorities next above.

3rd. Whenever the pledgee places the property pledged entirely beyond his control, and parts with his possession and interest, the relation of pledgor and pledgee is ended. That relation was terminated in this case by the sale to Denison. If this sale was right, there was a rightful end of it. If it was wrong, there was a wrongful end of it, and all the consequences of a disrupted contract and violated duty would result at once. The pledgee was liable to *assumpsit* or *case,* and the matter sought to be recovered, in either action, would be the entire value of the property, the subject matter of the bailment so wrongfully disposed of. If this property had been wilfully burned, or otherwise destroyed by the pledgee, the scope and object of a suit against him could not be wider than under the circumstances of this case. *Story on Bail.,* §§ 322 & 341. *Chinery vs. Viall,* 5 *Hurl. & Nor.,* 293. *Fenn, et al., vs. Bittleson,* 8 *Eng. L. & E. Rep.,* 483. And see authorities above cited.

4th. As against a third party who, by and under the wrongful sale, might come to the possession of the property, if the pawnee choose to do so, he could proceed for the recovery of the identical property. His right to the possession would

be re-vested in him in consequence of the breaking up of the bailment. There are instances when the pawnor could not recover the identical property from the vendee of a pawnee in a wrongful sale, but those instances are not determined upon the principle that the bailment still continues, and the right of possession does not re-vest in the pawnor, but they are cases where the pawnor has placed the pawnee before the world with a right to make an unqalified sale, and such sale is made to a *bona fide* purchaser for value.

5th. At the time, then, of the tender, demand, and refusal, no relation of pledgor and pledgee existed between the parties. The essential element which constituted it no longer existed; the pledgee could not *keep* the property safely. He could not return it upon tender and demand, because it was not within his power to control. See authorities above cited.

The character of the remedy provided by the agreement in this cause, when considered in reference to the facts, shows that the particular act set out in the prayer cannot be the basis of any action contemplated by the agreement. By the agreement in the cause an appropriate declaration must be considered as filed, based upon any *tort* disclosed by the facts in the case. As no other form of action, except that of an *action on the case* embracing *trover*, can be considered as applicable, the only inquiry is as to the scope of that action. The sale to Denison had taken place, and no vestige of control remained over the property in defendant. This was known for two years to the plaintiff, and no subsequent wrong took place. He then tenders the loan and demands the return of the property; to which the agent of defendant replies, that he thought the matter was settled. The demand was to return "*the capital stock,*" which was "*pledged*" for the purpose of the loan, "and to account for and pay the dividends on *said named* capital stock, and the interest on *said named bonds*" which had been realized. Was the fail-

Balto. Marine Ins. Co. vs. Dalrymple.

are to return the stock, under the circumstances, the proper subject of an *action on the case?*

1st. If, by the contract, the pledgee could discharge his duty by returning equivalent stocks and bonds, this was not demanded, and there has, therefore, been no refusal of performance.

2nd. *Torts,* upon which *actions on the case* are based, are injuries to the rights of person or property. They are the performance or omission of some act in reference to the rights of person, or to property, contrary to the general obligations of law, the particular rights and duties of the parties, or of some express or implied contract between them. The *contract,* in the last case, establishes the relation between the parties and creates the duty, and where property is concerned, and not personal right, the act, which is the ground of the action, is some omission or act in reference to the property itself. 1 *Ch. on Pl.,* 151. 2 *Arch. Nisi Prius,* 413. 2 *Ch. on Pl.,* 674.

3rd. *Torts* that grow out of the relation of bailor and bailee are injuries to the property bailed by the performance or omission of some act, contrary to the duty of the parties growing out of that relation. 1 *Ch. on Pl.,* 153, 154. *Corbett vs. Packington,* 6 *Barn. & Cress.,* 268. *Orton vs. Butler,* 5 *Barn. & Ald.,* 652.

4th. The refusal to deliver the stock could work no new result in reference to the property bailed. Everything that could be done to deprive the plaintiff of the property in question had been done before. The act of refusal was simply nugatory. It placed the defendant in no worse condition in regard to his property. The wrong which had already been done exhausted all the pledgee's power to do any further wrong or injury to the subject matter of the bailment. *Granger vs. George,* 5 *Barn. & Cress.,* 149.

5th. In all declarations in cases of *torts,* growing out of

contracts, the contract, and the duties arising out of it, and the breach of the contract are set out merely as inducement but the ground of the action is some act or omission in reference to the subject matter of the contract. It is the breach of duty or trust, arising out of the contract, and created by it, and not the breach of contract upon which *case* is sustained. A mere breach of contract is not a *tort*. It is ground for an action of *assumpsit*, not *case*. If this were not so, where is the distinction between the two forms of action? *Granger vs. George*, 5 *Barn. & Cress.*, 149. 2 *Arch. Nisi Prius*, 401, 402. 2 *Ch. on Pl.*, 674. 1 *Saund. Pl. & Ev.*, 735. *Corbett vs. Packington*, 6 *Barn. & Cress.*, 268. *Burnett vs. Lynch*, 5 *Barn. & Cress.*, 589.

7th. The refusal to do a thing, which it was entirely out of the power of the party to do, cannot be a *tort*. If an act has been done which puts it out of the power of the party to comply with his contract, that act may be a *tort*, and the basis of an *action on the case*. That act, in this case, was performed when the stock was sold to Denison, and it was then that the cause of action in this case accrued. *Edwards vs. Hooper*, 11 *M. & W.*, 363.

8th. Although it is not very material to this investigation, yet the question may well be asked: Was the refusal to deliver, in obedience to the demand, even a breach of contract for which the plaintiff could bring *assumpsit?* The relation of pledgor and pledgee having been broken up between the parties, and the act of the pledgor, known to the pledgee, having thus rendered it impossible to deliver upon demand, could a mere refusal, under the circumstances of the demand, be considered a breach of contract? *Williams vs. Woods & Bridges*, 16 *Md. Rep.*, 221. *Tempest vs. Kilnor*, 3 *M. G. & S.*, 253. *Shaw vs. Hilton*, 15 *M. & W.*, 145, 146.

The question of the measure of damages depends mainly upon the application of these principles. The views of the defendant, however, will be strengthened by other considerations drawn from the equity of the case.

1st. The invariable rule for damages in *trover*, in Maryand, is the value of the property at the time of the conversion. This is the rule in *trespass de bonis asportatis*. The rule is based upon the theory that the payment of the judgment vests a title to the property in the wrong-doer. This rule, of course, applies to cases where there is a total deprivation of the property. *Sterling vs. Garritee*, 18 *Md. Rep.*, 476. *Hepburn vs. Sewell*, 5 *H. & J.*, 211. *Schindel vs. Schindel*, 12 *Md. Rep.*, 109. 9 *Bac. Abr.*, 631. *Edwards on Bail.*, 272. *Story on Bail.*, secs., 122 & 349. *Clark vs. Marriott*, 9 *Gill*, 331.

2nd. The form of action in this case comprehends *trover*. *Trover* is one of the counts in *case*. The same wrong and injury which constitute the gravamen of the Court in *trover* must constitute the gravamen of every possible form of a count in *case* which can be framed upon the facts in the bill of exceptions. Upon what principle of law is it that a different measure of damages will be applied to different counts in the declaration upon the same facts, merely because the technical structure of those counts is different? *Sterling vs. Garritee*, 18 *Md. Rep.*, 469. *Johnson vs. Stear*, 3 *Am. Law Reg.*, (*N. S.*,) 760. *Chinery vs. Viall*, 5 *Hurl. & Nor.*, 293. *Sydenham vs. Jenkins*, 2 *Saund. S. C. Rep.*, 614.

3rd. The rule that damages are to be assessed as of the value of the property at the time that the act which creates the cause of action occurred, is not confined to *tort*. It is the rule in *assumpsit*. *Williams vs. Woods & Bridges*, 16 *Md. Rep.*, 259. *Shaw vs. Hilton*, 15 *M. & W.*, 145, 146. *Tempest vs. Kilnor*, 3 *M. G. & S.*, (54 *Eng. C. L. Rep.*,) 7, 8. *Woods vs. Fellows*, 20 *Wend.*, 288.

4th. This is the rule where there is a breach of trust by the trustee purchasing at his own sale, a case analogous to this; or when any wrongful act of the trustee deprives the *cestui que trust* of his property. *Ricketts vs. Whittington*, 13 *Md. Rep.*, 493.

5th. The invariable rule in Maryland, and the general rule elsewhere, for damages growing out of legal or equitable relations, when the party has been deprived of property wrongfully, is the value of the property at the time of the deprivation, with interest on that sum. Cases cited above. *Edwards vs. Hooper*, 11 *M. & W.*, 363. *Johnson vs. Stear*, 3 *Am. Law Reg.*, 760. *Sydendam vs. Jenkins*, 2 *Saund. S. C. Rep.*, 614. *Chinery vs. Viall*, 5 *Hurl. & Nor.*, 288. *Read vs. Fairbanks*, 24 *Eng. Law & Eq. Rep.*, 225, and 76 *Eng. C. L. Rep.*, 720, 759.

6th. The rules above named are not invariable in other States, and indeed in England, although they are general rules everywhere. The authorities from other States and from England are not always applicable, and are likely to mislead unless this difference is considered. *Wilson vs. Little*, 2 *Com.*, 449. *Cortelyou vs. Lansing*, 2 *Cain's Cases in Error*, 200,

7th. A variance from the above general rule, (5th above,) as existing out of Maryland, grows out of supposed equitable considerations not applicable to this case. It is conceded that generally the value of the property, at the time of the deprivation, is full compensation for all loss, because the party injured could then go into the market and buy the same property for that price. Suppose, however any article is involved, which a party, in all probability, would keep, and a loan is made of it to be returned on a given day. If it is not returned the party may not have the money to go into the market and buy. Suppose, also, the sale of an article to be delivered on a future day, and the purchaser has paid the cash, if delivery is not made at the day, the purchaser may not have the money to go into the market to buy other goods. Such cases as these have been considered as presenting claims for the highest price of the article; or the price at the trial, as a measure of damages in other States and in England. See cases above, and *Shepherd vs. Johnson*, 2 *East.*, 211. *Tempest vs. Kilnor*, 3 *M. G. & S.*, 253.

8th. The present case is not within the equity of the above exception. The pawnor had no right to the return of his stock, because a right to sell had accrued. He was deprived, by the act of the pawnee, of no money that rightfully belonged to him, with which to go into the market. His loan was due and was rightfully payable out of the proceeds of the stock. He never complained of the sale until there was a rise in the price of his stock. If, at the day of sale, a balance had been struck between the parties, and damages on both sides considered, on the one side for a breach of duty, and on the other for breach of contract, there would have been no difference between them. At the time of the breach the interest which both parties had in the broken relation between them was measured in gold, and two years after, the interest of the pawnor is measured in legal tender notes, and it will be found, by the evidence, that it is this difference which is sought to be recovered. Is there any equity in giving this inflated value to the the interest of the pawnor, and not to that of the pawnee also? They were in reality both affected alike by the rise in gold. See cases above. *Lockwood vs. Ewen,* 2 *Atk.,* 302.

The next ground of exception is the rejection of the defendants's first prayer. This may be taken in connection with the rejection of the second also. The law asserted by these prayers is, that the *sale and purchase* of the stock by means of agents of the defendant, as stated in the bill of exceptions, was good in law, if it was fair and *bona fide.* This question is involved in the other prayers already discussed, but is more directly presented in these. 1st. The transaction referred to in these prayers, being made through third persons in behalf of defendant, constitute a sale in law. *Williams' Ex'r vs. Marshall,* 4 *G. & J.,* 376. *Jackson vs. Walsh,* 14 *John.,* 414. 1 *Pars. on Contracts,* 87, *note (o) New Ed. Mason & Martin vs. Kemp,* 4 *Md. Rep.,* 124. *Pickering vs. R. R. R. Co.,* 1 *Am. Law Reg.,* 96. *Hill vs. Smith,* 32 *Verm. Rep.,* 433.

2nd. The sale, if fair and *bona fide*, is good in law, and the question of fairness and *bona fides* is for the jury alone.

3rd. The power of sale given in the contract of pledge is, in every respect, similar to other powers of sale given to agents and trustees, and is governed by the same laws. *Edwards on Bailments*, 255. *Hart vs. Ten Eyck*, 2 *Johns. Ch.*, 100. *Wilson vs. Little*, 2 *Com.*, (2 *N. Y.*,) 448. *Lawrence vs. Farmer's Loan & Trust Co.*, 3 *Kern.*, 210. *Sperry vs. Miller*, 16 *N. Y.*, 410.

4th. It is only in a Court of Equity that such sales are treated as void. *Williams' Ex. vs. Marshall*, 4 *G. & J.*, 376. *Jackson vs. Walsh*, 14 *John.* 414. 1 *Par. on Con.*, 87, (*note o*) *New Ed. Mason & Martin vs. Kemp*, 4 *Md. Rep.*, 124. 9 *Paige*, 650. *Ward vs. Smith*, 3 *Sandf. Ch. Rep.*, 592.

The third prayer of the defendant sets out the circumstances which follow the sale mentioned in the first prayer, viz : the sale to Denison, the information given by Denison to the plaintiff of the sale, the reply of the plaintiff thereto, the subsequent further depression of the stock, the lying by for two years, the tender, demand and refusal, and the reply thereto ; and it is submitted that, under the circumstances, the refusal was no *tort*. This question has already been discussed.

The fourth prayer of the defendant submits, in addition to the above facts, that the plaintiff knew of the transfer of stock, and that the delivery to him was impossible, and did not make said tender and demand with the intention that it should be effectual; and that, therefore, the tender and demand were nugatory acts and no *tort* upon which to ground the action. This prayer states with great force a proposition already discussed.

The fifth prayer asserts the proposition that, under the circumstances of the case, after the sale to Denison, there was no duty in the defendant to keep the stock. This question has already been discussed.

The sixth prayer submits that there is evidence in the case of acquiescence in the sales made by the defendant.

1st. What is acquiescence? The pawnee in this case was a *quasi* agent. Whatever acts would have given the authority to sell before the sale, would ratify it after the sale. *Ancona vs. Marks*, 7 *Hurl. & Nor.*, 686. *Byrd vs. Randall*, 3 *Burr.*, 1353.

2nd. This is not the case of a breach of duty and a waiver of the party's right to sue for this breach, but the question is, was there a breach of duty at all if the party consented to the act after it was done? Is not this evidence from which the jury may infer the authority before the sale?

3rd. Denison had purchased and then informed plaintiff. Ought he not to have notified Denison of his intention to treat the sale as a wrong? Could he lie by and see the stock depreciate until loss would have accrued to the defendant if it had returned it, and not have warned it that he intended to hold it responsible, so that it might have protected itself? Such conduct amounts to an estoppel in *pais*.

4th. The purchase by the defendant was not absolutely void, and may be cured by acquiescence. *Williams' Ex. vs. Marshall*, 4 *G. & J.*, 376.

The seventh and eighth prayers of the defendant are upon the question of damages. The seventh asserts that the jury ought to have been allowed to give a less sum than the value of the stock at the time of the demand.

The eighth prayer asserts that the jury should have been allowed to consider the fact that the sale was made while the banks paid in specie, but that the value of the stocks two years afterwards, for the purpose of swelling the damages, was taken in legal tender notes. A view of this question has already been taken, and upon computation it will be found that the entire increased value of the stock was the premium on gold.

The tenth prayer presents again the question of acquiescence already referred to.

*Thos. S. Alexander* and *Wm. Schley*, for Dalrymple:

In opposition to the appeal taken by the defendant, the plaintiff will insist:

I. That the sale by the defendant, through the agency of one broker to itself, purchasing through the agency of another, was contrary to its duty as pledgee, and did not alter the property in the pledge so attempted to be sold and purchased. Hence, the stock pledged, still remained, after such pretended sale, in the hands of the defendant, subject to redemption by the plaintiff; and the demand made for the return thereof, on the 16th of December, 1862, with the tender of the loan for security, whereof the deposit was made, completed the right of action of the plaintiff.

Authority will not be required for the purpose of showing that a pledgee, or other person, standing in a fiduciary relation, cannot sell to himself the thing pledged or intrusted to him for the purpose of sale. It will, therefore, be incumbent on the defendant to show some specialty which is to prevent the application of the rule of this case.

The defendant's first and second prayers were overruled as inconsistent in principle with the instruction given by the Court, and it is submitted, were properly overruled.

Where the trust is a pure trust, the execution of which, belongs to a Court of Equity, the parties aggrieved, must necessarily resort to equity for relief against every breach of duty on the part of the trustee. And in many cases of *quasi* trust, equity has interfered in order to afford the parties a better remedy than he could have obtained at law. But the relation of pledgor and pledgee is a legal relation. The rights and duties resulting from such relation are defined by law. And the remedy for a breach of duty, on the part of either party, if susceptible of compensation in damages, is to be found only in a Court of Law. *Jones vs. Smith,* 1 *Ves. Jr.*, 378. *Cortelyou vs. Lansing,* 2 *Caine's Ca.*, 200.

*Story on Bail.*, 287. And see 2 *Story's Eq..* 1032, to show that the pledgor cannot go into equity to redeem, except under special circumstances. *Hasbrouck vs. Vandervoort*, 4 *Sandf. S. C.*, 74. *Mark vs. Lawrence*, 5 *H. & J.*, 64, is a direct authority that a sale by a fiduciary to himself may be avoided at law. *Singstuck vs. Harding*, 4 *H. & J.*, 186. *Middlesex Bank vs. Minot*, 4 *Metc.*, 325. *Bank vs. Dubuque R. R. Co.*, 8 *Clark*, (*Iowa*,) 278. *Fox vs. Magrath*, *Wh. & Tud. Le. Ca. in Eq.*, 65, *Law Lib.*, 107, 141. *Walter vs. Smith*, 5 *Barn. & Ald.*, 439, (7 *Eng. C. L. Rep.*, 155.)

The defendant's 3rd, 4th, 5th, 6th, 10th and 11th prayers were properly rejected, for the following reasons:

1. If the sale by the pledgee to itself of the pledge was a tortious act, (as is assumed by the Court in its instruction to the jury,) it operated no conversion of the thing pledged. The plaintiff was, therefore, at liberty to ignore the fact of such sale, and to make a tender and demand at a time subsequent. And the refusal of the defendant to respond to such tender and demand by a return of the pledge, was a conversion upon which a recovery might be had. *Swayn vs. Stephens*, *Cro. Car.*, 433. *Middlesex Bank vs. Minot*, 4 *Metc.*, 325. *Bank vs. Dubuque R. R. Co.*, 8 *Clarke*, 278. *Carpenter vs. Hale*, 8 *Gray*, 157. 1 *Ch. Pl.*, 160. 2 *Id.*, 674. There could be no conversion until there was tender of payment. *Vincent vs. Cornell*, 13 *Pick.*, 294, 296.

2. The right of the plaintiff thus to redeem his pledge, was not prejudiced by the depreciation in value thereof at any time subsequent to the alleged tortious sale, and its enhancement in value at the time of the offer to redeem made by the plaintiff; nor is it to be affected by the knowledge of the plaintiff, that the defendant had, by a tortious disposition of the thing pledged, disabled itself from complying with his demand. Conceding, *argumenti gratia*, that the sale or

sales in November, 1860, effected an actual conversion, and not a conversion at the election of the pledgor, his remedy for that *tort* could not be prejudiced by *laches* simply for any period short of the statutory limitation, nor by any state of facts within that time, which is not imputable to his direct agency.

3. The only evidence of acquiescence in the alleged tortious sale is to be found in the statement by Denison, that at the time the plaintiff was notified of the fact of the sale "he made no objection to said sale, but said it cannot be helped, it is unavoidable." Taken in connexion with the admitted facts that the defendant had been repeatedly pressed by requisitions for additional margins, with which he was unable to comply, and that the sale was made in the face of his earnest remonstrances, the language imputed to the plaintiff imports nothing more than a confession on his part of his inability to prevent the sale thus effected by the defendant. In one sense this was acquiescence. The plaintiff acquiesced in the wrong perpetrated against him, just as the convict is supposed to acquiesce in his sentence by bowing his neck to the noose of the hangman. But acquiescence simply after the wrong has been consummated cannot bar the right to avenge that wrong. Confirmation is something more than acquiescence. And to give to confirmation the effect of barring the remedy against fraud actual or imputed, it must be shown that the party acted considerately, with intent to confirm, and with full knowledge of the facts and of the law thence resulting. None of these conditions exist in this case. The language imputed to the plaintiff was not considerately used. It was uttered by him immediately after he had received intelligence of the sacrifice of his property, and was provoked by the consciousness of his inability to protect himself. There is nothing in the language used, nor in the circumstances under which it was expressed, to justify the inference that the plaintiff intended to ratify or confirm the sale

thus recently made; and certainly there is no evidence from which the jury could be permitted to find that at the time of the interview between Denison and the plaintiff the latter was aware of the illegality of the sales reported to him.

It is not to be forgotten the defendant had parted with the stock to Denison, and at an advance in price, before the fact of either sale was communicated to the plaintiff. There is no pretext, therefore, for the suggestion that the defendant was mislead by the language imputed to the plaintiff on the occasion referred to. It is not alleged even that Denison, in visiting the plaintiff, acted, or professed to act, for the defendant, or that he imparted to the defendant what had passed between the plaintiff and himself. To sustain the position, that the *onus* was on the defendant to show that the tortious sale made by it to itself of the stock pledged was confirmed by the plaintiff deliberately and with knowledge of the facts and of his legal right to impeach such sale, reference is made to *Hoffman Co. vs. Cumberland Co.,* 16 *Md. Rep.,* 506, 507, 508.

II. As to the measure of damages:

The Court's instruction assumed that the refusal of the defendant, on the 16th of December, 1862, to accept the money tendered and to restore the stock was evidence of the conversion of the pledge on that day, and that under the circumstances the measure of damages was the value of the pledge on the day of such conversion.

It will be insisted that the defendant has no cause of exception to this instruction for the following reasons:

1. That the value of the thing wrongfully converted, as of the day of conversion is, in general, the measure of damages is settled by. *Hepburn vs. Sewell,* 5 *H. & J.,* 211. *Stirling vs. Garritee,* 18 *Md. Rep.,* 468.

In the discussion of the appeal taken by the plaintiff below, it will be shown that under special circumstances the jury

may allow damages according to the value of the thing at the time of the trial, or at any intermediate time.   But there is no authority in favor of the position that the jury may reduce the damages below the value of the property as of the day of conversion.   On the contrary, it is settled that the motive of the defendant, and by parity of reason, any other special circumstance of mitigation is material only as an answer to the plaintiff's demand for exemplary damages. Hence, the Court did right in rejecting the defendant's 7th prayer.   *Harker vs. Dement,* 9 *Gill,* 17.   *Finch vs. Blooms,* 7 *C. & P.,* 478.

2. The Court was also right in rejecting the defendant's 8th prayer, which insists that the jury are not bound to take, as the true value of the stock, the price at which it sold on the day of conversion, payable in depreciated bank notes or legal tender notes, but are at liberty to consider the depreciation of the currency in which said price was payable, in connection with other evidence in the cause.   The prayer, if otherwise unexceptionable, would be liable to the objection, that it does not define the character of the "other evidence" which is to be considered by the jury in connection with the proof of depreciation.   Looking to the line of defence pursued, it will be apparent that the defendant, under the guise of other evidence, intended to include those circumstances of supposed hardship, which it had already supposed by its seventh prayer, would in themselves warrant the jury in giving less in damages than the real value of the property which the defendant had wrongfully converted.

But the prayer is wrong in supposing that any disparity in value, between the gold currency of the country and paper made a legal tender by Act of Congress, can affect the assessment of damages for the property of which the plaintiff has been wrongfully deprived by the defendant The paper current as a legal tender at the time of the conversion, remained current as a legal tender at the time of

trial, and so remains at this day. A verdict rendered in current money of the United States might, therefore, have been, and yet may be, satisfied by the payment of an equal sum at par in the paper currency. Hence, it will be apparent that the defendant could sustain no injury by the assessment of damages according to the value in that paper currency. On the other hand, great wrong would ensue to the plaintiff if the market value of the property was supposed to be represented by an equivalent in paper at par, and this paper was to be reduced to its equivalent in gold, and then the reduced verdict was subject to be satisfied by a payment of an equal sum in paper at its par value. And yet, this is precisely the conclusion to which the defendant's eighth prayer, if granted, would lead.

Where the law of the country has established an equality in value between gold and paper, it is not competent for Courts of Justice to discriminate between them, or to commute the one into the other at any assumed rate of premium or discount. But in truth, the paper issued by authority of Congress is not, and does not profess to be, current money of account. It is issued primarily in payment of certain classes of public debts; and it is then made a tender or receivable in payment of certain description of public dues, and of private debts, termed domestic, in contradistinction to others which are esteemed foreign debts. It lacks, therefore, that universality which is inseparable from money of account. The privilege of making payment in paper is personal to the debtor. He may exercise or waive that privilege at his pleasure. If he does not avail himself of the privilege of making payment in paper he must be content to remain debtor for so much money of account, that is to say, so much gold or silver money.

In view of the fluctuating value of paper relatively to coin, it is possible that the Court would sustain a contract for payment in paper at a future day; and in the event of the re-

peal of the law, by which paper was made a tender, would assess damages in money of account, agreeable to the marketable value of the paper at the time of the breach. But in the absence of any special agreement, that is, where the contract is to pay in dollars, the parties must be taken to mean dollars according to their value in account as regulated and established by law. *Lodge vs. Spooner*, 8 *Gray*, 166. And, indeed, the very enactment of a tender law assumes that the debt is payable, by the terms of the contract, in money different from that which is made, by the tender law, to answer the purposes of money. And the same conclusion is supplied by the Constitution of the U. S., Art. 1, sec. 30, s. 1, "No State shall emit bills of credit, or make anything but gold and silver a tender in payment of debts." The paper issued by Congress is thus defined to be "Bills of Credit," and it is affirmed that the debtor is bound, by the obligation of his contract, to make payment in gold or silver. Upon this hypothesis, that the contract imports an obligation to pay in gold or silver money, money performs its office as the standard of values, and at the same time the debtor may indulge his privilege of making payment in paper so long as the tender law shall remain in force. Such is the general understanding.

On *quantum meruit* for services rendered, the measure of damages would be the value of those services expressed in paper currency. On *quantum valebat*, for goods or other property sold, damages would be assessed according to the market value of the article expressed in the same currency. But, in either case, the judgment would be rendered for so much current money of account, which would import gold or silver coins. And the reason of the rule is, that the damages, as thus assessed in paper, current in the usual commerce and business of the country, may be satisfied in the same currency in which it is valued.

As a practical illustration of the consequences of the defendant's position, let us assume that, at the time of conver-

sion, gold was at a premium of 100, payable in legal tender paper, and the stock converted was, at that time, worth 80 in money, the defendant would require the jury to value the stock at 40 in metallic currency, and would then exercise his privilege of satisfying that verdict in paper at its par value.

Upon the plaintiff's appeal two questions arise in relation to the measure of damages:

1. Whilst the capital stock of the Baltimore and Ohio Rail Road Company was actually held by the defendant, dividends were declared thereon, which were received by the defendant. Those dividends were accounted for to the plaintiff.

But after the 20th of November, 1860, and before the 16th of December, 1862, other dividends were declared and were paid to Denison, to whom the stock had been transferred by the defendant. The plaintiff insisted, by his *ninth* prayer, that the amount of those dividends ought likewise to be included in the estimate of damages to be made by the jury. But the Court rejected this prayer. It will be insisted, that if the conversion attempted in 1860, was tortious, and if the plaintiff was at liberty to treat the stock as remaining in the hands of the defendant on the 16th of December, 1862, and to sue as for a conversion on that day, the defendant is chargeable with all dividends declared on that stock, the fruits of that stock, which might have been realized, and would have been realized by the defendant but for its own wrongful act.

2. The plaintiff's *sixth* prayer claimed that the jury might, in its discretion, assess the value of the said capital stock at its highest market value on the day of trial, or on any other day before the said day, and after the day of demand and refusal.

This prayer was rejected by the court, but erroneously, as the plaintiff insists: Where property comes into possession of a party accidentally—without force or fraud—and is con-

verted by him, under a fair color of title, the measure of damages ought to be the sum realized by such conversion, or the current value in the market of the property converted. But where the defendant acquires the possession from or in privity with the title of the plaintiff, and the conversion is an act of bad faith,—in such case the measure of damages is not limited to the actual value of the property at the time of conversion, but may be aggravated to the full value thereof at the time of trial, or at any intervening period. *Cromwell vs. Owings,* 7 *H.* & *J.,* 60. *Harker vs. Dement,* 9 *Gill,* 17. *Bosley vs. Reynolds,* 8 *A.* & *E.* (*N. S.,*) 779. *Greening vs. Wilkinson,* 1. *C.* & *P.,* 625. *Martin vs, Porter,* 5 *M.* & *W.,* 352. *Fisher vs. Prince,* 3 *Bun.,* 1363. *Whitten vs. Fuller,* 2 *Bl.,* 602. *Cortelyou vs. Lansing,* 2 *Caine's Cases,* 200. *West vs. Beach,* 3 *Cowen,* 82. *Wilson vs. Matthews,* 24 *Barb.,* 295. *Harger vs. McManus,* 6 *Watts,* 418. *Backenstoss vs. Stahler,* 33 *Penn.,* 251. *Young vs. Frost,* 1 *Md. Rep.,* 402. *Rex vs. Bank of England,* 2 *Doug.,* 524. *Hepburn vs. Sewell,* 5 *H.* & *J.,* 211. *Kortright vs. Com. Bank,* 20 *Wend.,* 932. Same case in 22 *Wend.,* 350, 365. *Pars. on Cont.,* 473, ( *note b.*)

In equity the *cestui que trust* may recover the specific property from the trustee, or any person claiming under him with notice of the trust; or may, at his election, claim the value realized by the misapplication; or may pursue the value or equivalent throughout its mutations into other properties.

The principle on which this equity is administered is, that the trust fastens itself on the property, and substantial justice demands that the *cestui que trust* shall have his specific property, or all the profits which the trustee may or might have realized by a misapplication of the property. The same principle applies where a pledgee, in fraud of the bailment, withholds the pledge, or delivers it to another. The pledgor

ought to have a return of the thing pledged, or the highest value which could have been realized therefor, either by the pledgee or the person to whom it may have been wrongfully delivered. The pledgor is not bound to show that such highest value was actually realized, nor is the pledgee to be permitted to show that the sum realized by his breach of faith falls short of such highest value.

In an action for non-delivery of the stock of goods sold—for which the purchase money has been paid—the measure of damages is the highest value of the thing sold at the time appointed for delivery, or time of trial, or at any intervening period. *Shepherd vs. Johnson,* 2 *East.,* 211. *McArthur vs. Seaforth,* 2 *Tuunt.,* 257. *Downes vs. Buck,* 1 *Stark,* 251. *Gainsford vs. Carroll,* 2 *B. & C.,* 624. *Owens vs. Routh,* 25 *Eng. L. & E. Rep.,* 306. *Clarke vs. Pinney,* 7 *Cowan,* 681. *Rankin vs. McCullough,* 12 *Barb.,* 103.

Now, the condition of the bailor, whose stock is pledged for less than its value, is analogous to the case of a purchaser of stock who has advanced his purchase money. These cases are very different from that of a purchaser of stock to be paid for on delivery, who, on failure of the vendor to comply with his contract, may go into the market with his money and purchase other stock.

3. On the plaintiff's appeal is likewise presented the question whether the defendant can reduce the damages by discounting therefrom the sums loaned by the defendant to the plaintiff, and for security of which the stock was pledged?

The question was presented by the plaintiff's eighth prayer, which was rejected by the Court. It is submitted there was error in rejecting the prayer for the following reasons:

1. The lien of the pledgee is inseparable from the possession of the pledge. The pledgee, by surrendering or parting from the possession of the pledge, extinguishes his lien. The lien on the stock in question was, therefore, destroyed by the transfer made by the defendant to Denison, November, 1860.—

*Sweet vs. Payne,* 2 *East.,* 4. *McCombis vs. Davis,* 7 *East.,* 5. *Jacobs vs. Latour,* 5 *Bing.,* 130.

The lien did not pass with the stock to Denison. Hence, if the plaintiff had brought his action against Denison, he must have recovered in that action the full value of the stock, without discount or abatement, on account of the debt due from the plaintiff to the original pledgee. *Shipley vs. Kymer,* 2 *M. & S.,* 29.

But as a sale of personal property by a vendor in possession carries with it an implied warranty of title, Denison might have a recovery over against the present defendant for the full sum recovered by the plaintiff against him. *Mairs vs. Taylor,* 40 *Penn.,* 446. .

To prevent circuity of action, therefore, the measure of damages ought to be the same where the action is brought against the pledgee, as it would be where the action is against his transferee, else the aggrieved party would be tempted to waive his remedy against the wrong-doer and proceed directly against an innocent purchaser from him.

Tender, demand and refusal is said to be evidence of conversion. The pledgee in possession, under the bailment, is not bound to surrender the pledge, except on payment or tender of the debt secured by the pledge. But if he has tortiously converted the pledge, the bailment is thereby broken up, and a tender is not necessary to perfect the cause of action of the pledgor. *Coggs vs. Barnard,* 2 *Ld. Raym.,* 917. *Walter vs, Smith,* 5 *Barn. & Ald.,* 439. *Boardman vs. Sill,* 1 *Camp.,* 410.

The lien is, by the tortious conversion, destroyed. It is so expressly held where the party, having a general lien which he cannot enforce by a sale, tortiously sells or parts with possession. *Siebel vs. Springfield,* 9 *L. R.,* (*N. S.,*) 324. *Johnson vs. Shae,* 3 *Am. Law. Reg., N.* 8, 753. *Mark vs. Lawrence,* 5 *H. & J.,* 64. *Fishwick vs. Sewell,* 4 *H. & J.,* 393. *Salmon vs. Horwitz,* 28 *Eng. L. & E. Rep.,* 175.

And the same law must apply where the lien is special and the sale or disposition is tortious.

The rule is established to enforce the obligation of the bailment, and for the protection of the debtor. The debt is not discharged by the extinguishment of the lien, or even by the destruction of the pledge. But the pledgee, who has willfully broken up the bailment, shall not protect himself from responsibility by sheltering himself under a right, which had its origin and continued existence in that bailment. *Clark vs. Ridout,* 39 *N. R.,* 238. *Backenstoss vs. Stahlor,* 33 *Pa.,* 251. *Boardman vs. Sill,* 1 *Camp,* 410 *(note.) Thompson vs. Trail.* 6 *Barn. & Cress.,* 36. *Chinery vs. Viall,* 5 *Hurl. & Nor.,* 288. *Jacobs vs. Latour,* 5 *Bing.,* 120, *Co. Lit.,* 289. *Saltus vs. Everett,* 20 *Wend.,* 267, 273, 286. *Whitaker vs. Sumner,* 20 *Pick..* 399. *Fishwick vs. Sewell,* 4 *H. & J.,* 393. 2 *Pars. on Cont.,* 246, 247.

Nor is the recoupement to be claimed on the principle of discount or set-off. A debt is not to be set-off in an *action on the case* for damages. And there is nothing more than reciprocity in this. For if the creditor sues, as he may for the recovery of the debt, the debtor cannot set-off in that action the value of the pledge or damages for its tortious conversion; and as the debtor shall not embarrass the creditor in his action for the recovery of the debt, by tendering issues which concern the dealing of the creditor with respect to the pledge, neither shall the creditor seek to embarrass the debtor in his pursuit of damages for a tortious disposition of the pledge, by tendering issues which address themselves to the validity or amount of the debt. We say nothing of the right of the debtor to discount from the debt the proceeds realized by a valid sale of the pledge. *Abbott vs. Gatch,* 13 *Md. Rep.,* 332. *Van Buren vs. Ijams,* 11 *How.,* 47. *Withers vs. Green,* 9 *How.,* 213. *Winder vs. Baldwin,* 14 *How.,* 443, 444. *Jervis vs. Rogers,* 15 *Mass.,* 389.

The only conceivable ground on which the pledgee can be

38      v. 25.

permitted to set-off the debt against damages claimed for a tortious disposition of the pledge is, that *ex equo et bono*, the debtor, obtaining full compensation for the wrong done to him, ought not to decline payment of what is justly due from him to his creditor. "He who would have equity, must do equity." The maxim will be applicable if we are to assume that the parties stand as they would stand in equity, and that the account is to be taken as it would be taken in equity. In equity it is certain that the debtor may require the creditor to restore the pledge specifically in recovering the payment of the debt. The measure of damages ought, therefore, in such case, to be the value of the pledge at the time of trial, with all its intermediate profits reduced by the debt and interest thereon to the same time.

The plaintiff's second prayer ought to have been granted. There was evidence from which the jury might well have found the hypothesis of that prayer. The prayer itself, for perspicuity, is limited to the one hundred shares of Northern Central Rail Road stock last deposited, but the principle of law would equally have applied to the one hundred shares of Baltimore and Ohio Rail Road stock, and the four or five thousand of bonds of the Baltimore and Ohio Rail Road Company deposited at the same time. No special agreement was made in relation to these deposits, as to the *notice* to be given upon calling for payment of the loans, nor as to the *right to sell* these deposits upon failure to pay. In support of this prayer the following positions are submitted:

1. That reasonable notice for payment of the loans should have been given to the plaintiff, so that he might, if in his power, redeem the stocks; and what would, under the circumstances, have been reasonable notice, was a question for the jury,

2. No sale should have been made without reasonable notice to the plaintiff of an intention to sell said stock, specifying time and place of sale.

3. Sale, if made, should have been made at public auction, and not at the Stock Board.

4. Public notice should have been given by advertisement in the public papers, of the time, place, and cause of sale. *Brown vs. Ward.*, 3 *Duer.*, 660, *Wheeler vs. Newbold*, 5 *Duer*, 34. Same case in 16 *N. Y. Rep.*, 392, 399. *Stearns vs. Marsh*, 4 *Denio*, 227. *Rankin vs. McCullough*, 12 *Barb.*, 103. *Washburn vs. Pond*, 2 *Allen*, 474.

BARTOL, J., delivered the opinion of this court.

This suit was brought by Dalrymple to recover damages for the alleged conversion by the defendant, to its own use, of seven hundred and seventy shares of the capital stock of the Baltimore and Ohio Rail Road Company, eleven hundred shares of the stock of the Northern Central Rail Road Company, five bonds of the Baltimore and Ohio Rail Road Company, each for the payment of $1000, with interest, and ten bonds of the same company, each for the sum of $500, with interest.

The first declaration filed was in *trover*, to which the defendant pleaded and issue was joined; afterwards, it was agreed, "that in lieu of formal pleadings the plaintiff shall be considered as having amended his declaration by adding such counts in *tort* as the state of facts, to appear at the trial, would justify; and that the defendant shall be considered as having filed such pleas as the state of facts, as they appear at the trial, would justify,—and issues thereupon joined;" and with this agreement the case was to be tried upon the pleadings as they then stood, "all errors in pleading on both sides released, with leave to give the special matter in evidence; reserving to each party the same benefit of appeal as if formal pleadings had been put in."

After the evidence, disclosed in the bill of exceptions, had been given, the plaintiff presented nine prayers, of which

the fourth and fifth were withdrawn, and the seventh has been omitted from the transcript of the record; the rest were all rejected by the Court below except the third, which was granted with a modification set out in the Court's instruction.

The defendant offered eleven prayers, all of which were rejected except the ninth.    Both parties excepted to the ruling of the Court, and both parties have appealed.

It is not considered necessary here to state the several propositions of law contained in the prayers and the Court's instruction, or to recapitulate the facts offered in evidence and contained in the bill of exceptions.    The former will be noticed incidentally in the course of this opinion; and with regard to the latter, so far as we deem them material in the decision of these appeals, there seems to have been no dispute.

The stocks and securities for the alleged conversion, or illegal disposition of which by the defendant, the suit is brought, were pledged by the plaintiff to the defendant as security for certain loans.    The terms of the pledge are evidenced by written contracts offered in evidence, and are very similar to those recently before us in the case of *The Maryland Fire Insurance Company vs. Dalrymple.*    They contain the same stipulations, requiring additional securities, by way of margin, to be furnished when called for during the continuance of the loans; binding the plaintiff to repay the loans within a certain stipulated time after the same shall be demanded, and in case of default authorize the defendant, *"without further notice,"* to sell the stock and securities pledged for the purpose of satisfying the same.    Some of the loans were repayable on one day's notice, and some on three days' notice.

It appeared in evidence that some of the securities, that is to say, one hundred shares of the stock of the Northern Central Rail Road, one hundred shares of the Baltimore and Ohio Rail Road Company stock, and $5000 of the dividend

bonds of the Baltimore and Ohio Rail Road Company, were deposited in pledge with the defendant as margins or further security on the general loans; and on these last an additional loan of $4000 was made. With regard to these particular pledges, thus deposited by way of margin, no express stipulation was made, and the defendant, in its ninth prayer, asked the court to instruct the jury, that it ( the defendant ) had the right to sell them upon the longest term of notice stipulated in the written agreements offered in evidence, as to the previous existing loans and pledges constituting the general indebtedness, in the terms thereof. This prayer the court granted, and in our opinion there was no error in this ruling, or in rejecting the second prayer of the plaintiff relating to the same subject. It is obvious that the securities put up as margin were pledged according to the terms of the written contracts—this is the plain meaning of the contract —the rule being that the accretion follows the main body, and is subject to the same conditions.

It appears from the proof, that in November, 1860, due notice, according to the contracts, was given to the plaintiff to repay the money loaned, and upon his default, the defendant proceeded to sell the stocks and securities pledged, publicly at the Board of Brokers in Baltimore, all of them except the seven hundred and seventy shares of the Baltimore and Ohio Rail Road stock were then sold, that is to say : five hundred shares of the Northern Central Rail Road stock, on the 15th of November ; and on the 20th of November, the other collaterals, except the stock of the Baltimore and Ohio Rail Road Company, were sold in the same manner to various persons, after express notice of such intended sales had been given to the plaintiff.

The effect of such a sale has been fully considered by this Court in the case of *The Maryland Fire Insurance Compang vs. Dalrymple,* (*ante p.* —,) in which it was held, that sales so

made are valid and legal under contracts like those now before us; and for reasons stated in the opinion in that case, it was decided that no valid objection could be urged against them by reason of their being made at the Board of Brokers. It follows, therefore, that the sales of the collaterals which were made to third persons in this case, not being impeached on the ground of fraud or unfairness, were legal and valid, and in respect to them the plaintiff cannot maintain the present suit.

It remains now to consider what are the rights of the parties in respect to the seven hundred and seventy shares of the stock of the Baltimore and Ohio Rail Road Company.

That was put up for sale at the Board of Brokers on the 20th of November, 1860, and bought by the defendant through the agency of a broker employed for that purpose. Precisely the same kind of transaction came before us for examination in the case of the *Maryland Fire Ins. Co. vs. Dalrymple*, before referred to, and it was declared that both in a Court of Law and a Court of Equity such a sale by a pledgee to itself, in the absence of consent or acquiescence on the part of the pledgor, was illegal and ineffectual to pass the absolute title to the pledgee as purchaser. Secondly, that it did not operate as a conversion of the property so as to break up the bailment, except at the election of the pledgor, and in the absence of such election the bailment continued in the same manner as if such attempted sale had not been made. According to that ruling the first and second prayers of the defendant in this case were properly refused.

After the attempted sale and purchase of the stock by the defendant, as stated in the testimony of Marcus Denison, some apprehension was felt that the stock, which had been bid in at $54¾ per share, would still further decline, and at a session of the Finance Committee of the defendant, the same evening, objections were made to holding the stock; whereupon the witness offered to purchase it at $55 per

share, and proposed that his offer might be held till the next day. On the next day the committee declined the offer, but offered to sell at $56 per share, at which price witness purchased the seven hundred and seventy shares on the 21st of November, 1860, and the stock was transferred to him. Immediately afterwards, the plaintiff was informed of the sales of the stock at the board, and also of the purchase made by the witness.

There is some conflict of testimony as to the reply made by the plaintiff on receipt of this information. It has been argued on behalf of the defendant, that there was evidence from which the jury might find consent and acquiescence on the part of the plaintiff in the disposition that had been made of the stock, and on this hypothesis the sixth, tenth and eleventh prayers of the defendant are based. In the view we take of the case, the question presented by these prayers is not material. We think, however, there was no error in rejecting them, and shall proceed to consider the other questions presented, assuming that there was no evidence of such acquiescence on the part of the plaintiff as to defeat this action.

Proof was offered that on the 17th day of December, 1862, the plaintiff tendered to the defendant the amount of the loans with interest, and demanded a return of all the stock and collaterals pledged; the tender was made to the defendant's agent, who replied, that "he thought the matter was settled," and refused the tender. Evidence was given that the stock of the Baltimore and Ohio Rail Road Co. was worth $77 per share on the 17th of December, 1862; and it was also proved that the same stock had fluctuated in value from November, 1860, selling in April, 1861, as low as $40 per share.

It was also proved, that there were dividends on the same stock on the 27th of October, 1860, the 15th of April, 1861, the 28th of May, 1862, and the 30th of September, 1862,

and that the interest on extra dividend bonds was payable in June and December, and was paid in full to all parties claiming it to June, 1st 1862, when it ceased to bear interest and was converted into stock of the company.

The questions presented for our decision are: 1st. As to the plaintiff's right to recover. 2nd. As to the measure of damages. 3rd. As to the right of the defendant to *recoupe* from the damages the amount of the loans.

We have virtually determined the first question in the case of *The Maryland Fire Insurance Company vs. Dalrymple.* As we have already said the attempted sale and purchase by the defendant at the board was inoperative; the possession of the stock remaining unchanged, the bailment continued thereafter as before. But notice having been given under the contract, and the plaintiff being in default, the power to sell continued, and if it had been legally exercised no action of *tort* could be maintained. But according to the rule laid down in the former case, the defendant had not the legal right to dispose of the stock at private sale. The sale so made to Denison on the 21st of November, 1860, was therefore contrary to the duty of the defendant as pledgee and in law tortious, for which, the plaintiff is entitled to maintain his action either in *trover* or *case.*

The next question is, what is the measure of damages? The plaintiff in his sixth prayer asked for an instruction to the jury that they might, in their discretion, assess the value of the stocks at their highest market value on the day of trial, or on any other day before that time, and after the day of the demand and refusal.

The Court rejected that prayer, and instructed the jury that "in estimating the damages they were bound to give to the plaintiff what they might find from the evidence to have been the market value of the seven hundred and seventy shares of stock on the 17th of December, 1862, with interest thereon, deducting therefrom the sum loaned and interest."

After a mature consideration of this question and a careful examination of all the authorities cited in argument, we are of opinion that this instruction was erroneous, and we consider the proposition contained in the plaintiff's sixth prayer as still more untenable. The *tort* complained of here, and which is the ground of this action, was committed on the 21st of November, 1860, by the sale and transfer of the stock to Denison. The plaintiff, well knowing the fact, lay by until December, 1862, when he made the tender and demand, long after the stock had been parted with, and when it was no longer in the defendant's power to return it, and then assuming to treat the refusal to comply with the demand as the tortious act, attempts to make it the ground of his action. This is not only contrary to reason, but in direct opposition to the well settled principles of the law.

The sole object and design of the law in awarding damages to a plaintiff, is to compensate him for the injury he has actually suffered from the wrongful act of the defendant. We leave out of view that class of cases in which, by reason of the bad faith or moral turpitude of the act complained of, exemplary or primitive damages, by way of smart money, are allowed. This is not a case of that kind. The tortious act of the defendant was in the breach of legal duty arising out of the contract, and the damages ought to be compensatory merely.

In actions *ex contractu* between vendor and vendee, brought to recover damages for a breach of the contract of sale, the rule of damages is well settled. In *Tempest vs. Kilnor*, 3 *Man Gr. & Scott*, (54 *Eng. C. L. Rep.*, 248,) decided in 1846, which was *assumpsit* by vendee on a contract for the sale of shares in a projected railway, it was held that the measure of damages was the difference between the contract price and the actual price at the time when the shares ought to have been delivered, that is, at the time of the breach, and the

plaintiff could not recover beyond that day. TINDAL, C. J., said "the plaintiff had no right to lie by until the concern became profitable." The same rule was applied in *trover*, in *Reid and Stewart vs. Fairbanks and others, in the Common Pleas,* 4 *J. Scott,* (76 *Eng. C. L. Rep.,* 692.) In *Hill vs. Smith and Carpenter,* 32 *Verm.* 433, *assumpsit* by vendee claiming damages for a failure to deliver merchandise purchased, it was held that the measure of damages was the market value at the time stipulated for delivery, and that the rule was not altered by the payment of the price in advance.

The same rule has been expressly recognized and adopted by this Court in *Williams vs. Woods, Bridges & Co.,* 16 *Md. Rep.* 220. There is no reason why this rule should not apply to a case like the present, and the plaintiff be confined to the damages actually suffered at the time the *tort* was committed. On what ground can the plaintiff claim compensation on the basis of the value of the stock in December, 1862? There was no *tort* committed at that time by the defendant, nor did the tender, demand and refusal operate to give him a cause of action. They were merely nugatory. It is settled that if there has been a wrongful sale of the pledge, no tender of the debt due need be made before bringing an action therefor. *Story on Bailments, sec.* 349.— *Stearns vs. Marsh,* 4 *Denio,* 227. *Fenn vs. Bittleson,* 8 *Eng. L. & E. Rep.,* 483. *Edwards and others assignees vs. Hooper and another,* 11 *Mees. & Wels.,* 362. In the case last cited the plaintiff's assignees in bankruptcy relied on a demand and refusal as the ground of their action, the conversion having taken place before the *fiat* in bankruptcy, it was held the suit could not be maintained. Parke, Baron said : "if the goods were in possession of the defendants, a demand and refusal would be evidence of a conversion. But it is not so in a case where the goods have been previously parted with by sale. There cannot be an effectual demand and refusal

unless the party has at the time possession of the goods and has the means of delivering them up."

In *Greenleaf's Ev.*, *vol.* 2, *sec.* 644, the effect of a demand and refusal is correctly stated, and many cases cited. In *Dietus vs. Fuss*, 8 *Md. Rep.*, 158, the case in 11 *Mees. & Wels.*, and the sections of *Greenleaf* on this subject were cited and approved. It follows from these authorities that the demand and refusal in this case could have no effect either in giving to the plaintiff a right of action, or to fix the measure of damages.

Treating this case as an action of *trover*, we consider the rule well established, that the proper measure of damages is the actual value of the stock at the time of the conversion, deducting of course the amount of the debt due the defendant by way of recoupment, of which we shall speak presently. This is the general rule in actions of *trover* and has been long recognized in Maryland. See *Hepburn's Admr. vs. Sewell*, 5 *H. & J.*, 211. *Sterling vs. Garritee*, 18 *Md. Rep.*, 469. In Massachusetts the same rule is established. See *Kennedy vs. Whitwell*, 4 *Pick.* 466, and other cases cited by *Sedgewick on the Measure of Damages*, 504, *note*. In Kentucky the rule is the same, and it has been recently recognized by the Supreme Court of New Hampshire, in *Pinkerton vs. Manchester and Lawrence Rail Road*, reported in 1 *Am. Law Reg.*, *N. S.*, 96, where many authorities are examined and the question discussed in a very elaborate and well considered opinion. See also the note of Judge Redfield appended to that case, pages 115, 116. The reported cases in New York are not uniform, and in some of them the rule has been departed from; nor is it easy to reconcile all the English cases where this question has arisen.

In our opinion the general rule above stated as laid down in *Hepburn's Admr. vs. Sewell*, and *Sterling vs. Garritee*, is a stable, sound and just rule, and ought to be applied in this case, whether we consider the action as in *trover* for the

conversion, or as a special action in *case*. The change in the form of the declaration cannot alter the rule of damages. In *Chinery vs. Viall*, 5 *Hurl. & Nor.* 287, where the declaration contained a special count, and a count in *trover*, the rule of damages above stated was applied. Bramwell, B., said: "the principle deducible from the authorities was, that a man cannot by merely changing the form of action entitle himself to recover damages greater than the amount to which he is in law entitled, according to the true facts of the case and the real nature of the transaction."

We do not deny that there may be special circumstances which will take a case out of the operation of the general rule and entitle a party to recover, in *trover* or *case*, more than the value of the property at the time of the conversion; such was the case of *Bodley vs. Reynolds*, 8 *Ad. & E.*, 779. (55 *Eng. C. L. Rep.*) So in *Wilson vs. Little*, 2 *Comstock*, 443, much relied on by the plaintiff's counsel; that was an action on the case by a pledgor against the pledgee for wrongfully selling stock pledged in security for a loan. It appeared in proof that the stock was disposed of on the 24th of December when the market price was $68 the share, when the defendant had no right to sell. The plaintiff, not being aware that the stock had been sold, offered to redeem the pledge, and at the instance of the defendant, who promised to return it, consented to wait, and it was not till the 2nd of January that the defendant ceased to hold out the expectation of restoring the stock, or stock of the same kind and equivalent value, which the plaintiff was willing to take; at that time the stock was worth $85 per share. It was held, under the circumstances, that the plaintiff was entitled to recover according to the value of the stock on the second of January, when the defendant finally failed in his promises to restore it. We consider that decision as manifestly just, and not in conflict with the general rule before stated. The special rule there applied can have no application to the

present case. Here there are no special facts or circumstances which, either in law or justice, entitle the plaintiff to claim more than compensation for the injury actually suffered by him at the time the *tort* was committed ; and that can only be properly estimated by considering the actual market value of the stock at the time it was sold and transferred to Denison.

We consider it perfectly clear, that the view taken by the Court below on the question of recoupement was correct; and that in ascertaining the damages, the amount of the debt due the defendant, to secure which, the stock and other collaterals were pledged, ought to be deducted. The law is so expressly stated by Story in his work on Bailments, secs. 315, 349. It is supported by the authorities cited by him, and is consistent with the general doctrine of recoupement, established in modern cases, and recognized by this Court in *Abbott vs. Gatch*, 13 *Md. Rep.*, 314. *See also, *Stewart vs. Rogers*, 19 *Md. Rep.*, 117, 118. In such a case as this, the application of this doctrine does not rest upon the principle of lien, and the cases of that description cited in argument by the plaintiff's counsel are, in our opinion, inapplicable. In the recent case of *Johnson, Assignee, vs. Stear*, decided in the Common Pleas in England, and reported in the 3rd *Am. Law Reg.*, (*N. S.*,) 753, the doctrine of recoupement in a case like this was considered and decided, and we fully concur in the conclusions of the Court there stated.

*Note by Reporter.—In the head notes to the case of *Stewart vs. Rogers et. al.*, 19 *Md. Rep.*, 98, the following appears to have been omitted:

The assumption that the plaintiff forfeited all claim to charges for services, management, advances, &c., if the jury believed he sold the bark without authority, is erroneous; the plaintiff might by the course of dealing between the defendant and himself have become entitled to a balance on account against the defendant, and the latter have a claim against the former for the value of the vessel improperly sold; the conversion or trespass of the plaintiff would not extinguish the debt of the defendant.

Considering that there was error in the ruling of the Superior Court, as to the measure of damages in this case, the judgment will be reversed on the defendant's appeal, and the plaintiff will have leave to take out a writ of *procedendo.*

> *Judgment reversed, with leave*
> *to take out procedendo.*