(151 App. Div. 866.)

MAYER et al. v. MONZO.

(Supreme Court, Appellate Division, First Department.    July 11, 1912.)

1. PLEADING (§ 262*)—TRIAL AMENDMENT—NEW OR DIFFERENT DEFENSES OF COUNTERCLAIM.

Where the answer, in a stockbroker's action to recover the balance of an account, set up a counterclaim for a conversion alleged to have consisted in permitting the defendant's stock to be sold by banks and other institutions with which it had been pledged by plaintiff, a trial amendment, alleging the conversion to have taken place when the stocks were pledged, and to have consisted of the fact that they were commingled with other securities, and that such securities were pledged for a sum in excess of that which defendant then owed plaintiff, was inconsistent with the counterclaim originally pleaded, and should not have been allowed.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 801; Dec. Dig. § 262.*]

2. BROKERS (§ 24*)—LIABILITIES—PURCHASES OF STOCK ON MARGIN—CONVERSION.

A broker, who buys stocks for a customer on a margin, is entitled to pledge the stock for the balance due on the purchase price, and his whole duty to his customer is either to have the stocks on hand or under his control, and there is a conversion only upon refusal of the customer's demand for his stock with a tender of the balance due thereon.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 19; Dec. Dig. § 24.*]

3. BROKERS (§ 37*)—ACTION—COUNTERCLAIM FOR WRONGFUL ACTS—SUFFICIENCY.

A counterclaim, in a stockbroker's action to recover the balance of an account claiming damages for conversion of stock, which does not show that defendant ever demanded his stock and offered to pay the balance of the amount due thereon, nor that if he had done so the broker had placed himself in such a position that he could not have repossessed himself of the stock and made delivery, stated no cause of action.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 31-36; Dec. Dig. § 37.*]

Clarke, J., dissenting.

Appeal from Trial Term, New York County.

Action by Marcus Mayer and others against Angelo R. Monzo. From a judgment directed by the court in favor of the defendant upon his counterclaim for $43,623.81 in an action by stockbrokers to recover the balance of an account, and dismissing the complaint,

*For other cases see same top. c & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and from an order denying a new trial, plaintiffs appeal. Judgment and order reversed, and new trial ordered.

See, also, 134 App. Div. 961, 119 N. Y. Supp. 512.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Colby & Goldbeck, of New York City (David Leventritt, of New York City, of counsel, and William F. Goldbeck, of New York City, on the brief), for appellants.

Sumner & Perry (Herbert C. Smyth, of New York City, of counsel, and Roderic Wellman, of New York City, on the brief), for respondent.

SCOTT, J. I do not think that this judgment can be sustained. The facts have been so carefully and exhaustively stated by Mr. Justice CLARKE, that it is unnecessary to restate them.

[1] The counterclaim upon which the defendant has recovered was a claim for damages for conversion of stocks, and, as the pleadings stood when judgment was rendered, the defendant relied upon two inconsistent allegations of conversion, one committed on October 22, 1907, and one committed prior thereto. As the answer was originally drawn, the conversion is stated as having taken place October 22d, and to have consisted in permitting the stocks to be sold by banks and other institutions with whom plaintiffs had pledged them. By the amendment, allowed at the trial, the conversion is alleged to have taken place when the stocks were pledged and to have consisted of the fact that they were commingled with other securities; the commingled securities being so pledged for a sum in excess of that which defendant then owed plaintiff.

I think, in the first place, that this amendment was one which should not have been allowed at the trial, for it introduced an entirely new and different cause of action, alleging as the ground for recovery an entirely distinct tort from that which was originally alleged. Passing that objection, however, it is manifest that the cause of action set forth in the amendment was inconsistent with that originally pleaded, for if plaintiffs converted defendant's stocks prior to October 22, 1907, there could have been no conversion on that date, as there was nothing left to convert.

[2, 3] That it is a conversion ipso facto to commingle stocks belonging to different customers and to obtain a loan on all, in excess of the amount due from any one of the customers whose stocks are thus commingled, I do not concede. It is settled that a broker who buys stocks for a customer upon margin, and to whom the customer still owes a part of the purchase price, is entitled to pledge the stocks so bought for so much of the purchase price as his customer still owes. The broker's whole duty to his customer, under such circumstances, is either to have on hand or under his control the stocks which he is carying for his customer; but he is not required to do both—that is, to have the amount of stocks under control and also an equal amount on hand. The customer's right to receive his securities accrues, under such circumstances, only when he tenders the

amount he still owes and demands his stock. The refusal of such a demand constitutes the conversion. If the broker has the stock under his control (even if it be pledged), and can resume possession by paying the amount borrowed thereon, not exceeding the amount which the customer owes on account of the purchase, there has been no conversion.

It does not appear that defendant ever demanded his stock and offered to pay the amount which he owed, nor does it appear that, if he had done so, plaintiffs had placed themselves in such a position that they could not have repossessed themselves of the stock, and made delivery. I am therefore of opinion that no cause of action was made out under the amendment to the answer.

As the reasoning in favor of the affirmance of this judgment rests wholly, or at least principally, upon what I deem to be the erroneous conclusion that the original hypothecation of the stocks was illegal and itself constituted a conversion, it seems to be unnecessary to discuss the separate charge of conversion contained in the answer as originally drawn.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to appellant to abide the event.

INGRAHAM, P. J., and McLAUGHLIN and LAUGHLIN, JJ., concur.

CLARKE, J. (dissenting). This is an action brought by a firm of stockbrokers against a customer to recover $39,843.10, balance claimed to be due upon a speculative account. The complaint alleged that upon the defendant's request, and on margin supplied by him, plaintiffs had bought and sold on account various stocks on the New York Stock Exchange and advanced divers sums of money to and for the use of defendant in such transactions at divers times from the 9th of July, 1906, to the 1st day of October, 1907; that as a result of said transactions defendant became and was indebted to plaintiffs on said date in the sum of $173,918.35 as against 1,900 enumerated shares of stock bought at defendant's request for his account and which plaintiffs were then carrying for defendant at his request; that said 1,900 shares of stock had been purchased at various times between September 24, 1906, and August 1, 1907, and at the time of the purchase of each item thereof the shares so purchased were, in accordance with the usual custom of stockbrokers in such cases, bought in plaintiffs' names and delivered to plaintiffs by the respective vendors thereof, and said stocks were thereupon, in accordance with the usual custom of stockbrokers in such cases, pledged by plaintiffs as collateral security for loans obtained by plaintiffs for the purpose of paying for and carrying said stocks on margin; that on October 1, 1907, said 1,900 shares of stock, as plaintiffs are informed and believe, were in the possession of the banks and other financial institutions from which said loans had been obtained as collateral security therefor, and continued in the possession of said pledgees until on or

about the 22d and 23d days of October, 1907; that on said 1st day of October, 1907, an account was stated, and it was mutually found and agreed that defendant was indebted to plaintiffs for $173,928.35 and that his holdings of stock were those enumerated; that on the 1st day of October, the closing price of said stocks was $156,575; that the value of said stocks on said day was over $17,000 less than defendant's aforesaid indebtedness, so that defendant's margin was not only wholly exhausted, but his account showed a net loss of over $17,000; that plaintiffs on said date, and repeatedly thereafter, to and including the 22d day of October, 1907, called upon defendant for margin, but that defendant failed to supply the same and requested plaintiffs to protect his account and carry his said stocks for him as long as they could; that, complying with defendant's said request, plaintiffs continued to carry his said stocks until October 22, 1907, without receiving further margin from him; that on said day the market prices of the said stocks fell to $134,150; that at the aforesaid prices the net loss on the defendant's said account amounted to over $39,000, and plaintiffs being, on said day, called upon by the banks and financial institutions from which they had obtained loans as aforesaid on defendant's said stock as collateral for additional margin and security, and being unable to provide same by reason of defendant's failure to supply them with the necessary and proper margin to protect his account, and by reason of the exhaustion of their own resources, were obliged to and did on the 22d of October, 1907, suspend and make a general assignment for the benefit of creditors; that on the following day, October 23d, they were petitioned into involuntary bankruptcy, and a receiver was appointed by the United States District Court who took possession of the property and assets of the plaintiffs; that on November 21, 1907, they were adjudicated bankrupts; that said bankruptcy proceeding continued until April 25, 1908, up to which time said bankrupt estate was administered by said receiver; that on said day plaintiffs by settlement made with all their creditors became free and clear of all indebtedness, and the said bankruptcy proceeding was vacated and discontinued by order of the United States District Court, and plaintiffs were shortly thereafter reinstated on the Stock Exchange; that upon plaintiffs' suspension and involuntary bankruptcy the aforesaid 1,900 shares of stock in defendant's said account as aforesaid were duly sold on or about October 22d and 23d at the average market prices then prevailing, by the various banks and financial institutions with which they had been pledged by plaintiffs as aforesaid, in liquidation of the aforesaid loans, for $132,700.25; that defendant is entitled to a credit for dividends collected by plaintiffs of $1,375; that by reason of the premises defendant is justly indebted to plaintiffs in the sum of $39,843.10 with interest.

For a counterclaim the defendant averred that at all times mentioned herein defendant was able and willing to deposit such further and additional sums of money as margin on his said account

as might be necessary to protect same, but that plaintiffs never demanded of defendant additional margin on his account or informed defendant that they would close the said account if additional margin was not deposited, and defendant never directed or authorized plaintiffs to close out his said account; on information and belief that on or about the 1st of October, 1907, plaintiffs had previously bought and were carrying for defendant's account upon his instructions 1,900 shares of stock which defendant was at all times ready and able to secure with sufficient margin, and which he at no time authorized or directed plaintiffs to sell.

As the answer stood at the time the case went to trial, paragraph 14 read as follows: On information and belief, that said shares of stock were still held by plaintiffs for defendant's account on October 22, 1907, and on or about that date, in violation of their legal duty and their agreement with defendant to sell only on his instructions, plaintiffs sold or caused to be sold all of the 1,900 shares of stock aforesaid at prices amounting to $132,700.25, less commission and tax, and therefore, although repeatedly requested to do so, refused to notify defendant of the condition of his said account and of the said sales until the 3d of December, 1908, and have at all times refused to notify defendant of the names of the persons to whom said sales were made, contrary to their legal obligations as defendant's brokers. (15) That since the 22d of October, 1907, the prices of the stocks sold by plaintiffs as aforesaid have advanced very materially, and on information and belief on said 3d day of December, 1908, the market value of said 1,900 shares of stock amounted to $204,475.25, showing a loss to defendant by reason of plaintiffs' said unauthorized sales of $71,775. (16) That solely by reason of plaintiffs' unauthorized and unlawful act in closing out defendant's account as aforesaid, defendant has been damaged in said sum.

Upon the trial, and over objection after it had appeared that the stocks of defendant had been mingled with many others and had been hypothecated for loans far exceeding his indebtedness, the fourteenth paragraph was amended to conform to the proof, as follows:

"On information and belief, that said shares of stock on October 22, 1907, were held by financial institutions and banks with which they had been pledged by plaintiffs, on or about the dates that said stocks were purchased, on account of the defendant, and that said stocks at said time of said pledging were commingled with many other shares of stock and were pledged in loans with said banks and financial institutions in several loans aggregating in amount considerably more than the amount due from defendant for the purchase of said stocks on the days that the same were so purchased, as aforesaid, and that at the time of said pledging the plaintiffs did not have any stocks of like kind or character, except such stocks as were owned or which had been bought on account of other customers of the plaintiffs, and that at no time from the time of purchase of said stocks on account of defendant until on and after the 22d day of October, 1907, did the plaintiff have any stocks of like kind or character other than those which belonged to or which had been purchased on account of other customers of said plaintiffs, but the defendant was ignorant of and had no knowledge or information of the pledging of his stocks as aforesaid, and remained ignorant thereof until after the commencement of this action,

and that on or about the 22d day of October, 1907, in violation of the·plain-tiffs' legal duty and their agreement with defendant to sell only on his instructions, plaintiffs, without notice to defendant, made a general assign-ment to their attorney, Mr. William F. Goldbeck, and that subsequent there-to, to wit, the afternoon of the same day, a petition in involuntary bank-ruptcy was filed against these plaintiffs as alleged in the complaint, and that said bankruptcy proceeding was subsequently, to wit, in the month of May, 1908, terminated by consent of the plaintiffs and all the creditors who had been notified of said bankruptcy proceedings, and that the defendant received no formal or written notice of said bankruptcy proceeding and was not made a party thereto; that on the 22d day of October, 1907, and days subsequent thereto, said 1,900 shares were sold by the banks or finan-cial institutions with which they were pledged at the prices obtaining on said day or days, and that defendant had no notice or knowledge thereof until after the commencement of this action, and that defendant did not receive any notice from the plaintiffs that his said stocks had been sold until on or about the 3d day of December, 1908, and that the plaintiffs, after the 22d of October, 1907, although repeatedly requested to do so, re-fused to notify defendant of the condition of his said account and the said sales until the 3d of December, 1908, and have at all times refused to notify defendant of the names of the persons to whom said sales were made, contrary to their legal obligations as defendant's brokers."

And amended the fifteenth and sixteenth paragraphs by striking out the figures $71,775 and substituting in place thereof $35,929.90, and amended the prayer so that the amount demanded is $36,864.45 with interest from December 3, 1908.

At the close of the case, after motions to dismiss the counterclaim had been denied, the defendant moved to dismiss the complaint and moved for the direction of a verdict on the counterclaim for $36,-864.45 with interest. The plaintiff moved for the direction of a ver-dict for $40,068.10 principal and $10,465.46 interest, making a total of $50,535.56. The court dismissed the complaint and directed a ver-dict for the defendant for $43,499.81, and from the judgment en-tered thereon and the order denying a new trial the plaintiffs appeal.

To summarize the change in the situation which occurred upon the trial, the counterclaim as originally interposed claimed a conversion on October 22d by a sale without notice. By the amended answer defendant claims conversion by wrongful pledge at the time of the purchase, in addition to the original plea of conversion by sale with-out notice.

It appeared in evidence that the defendant had opened a specula-tive account with the plaintiffs in July, 1906, for the purchase and sale of stocks on margin, as a result of which on August 1, 1907, plaintiffs held 1,900 shares of stock which they had bought upon de-fendant's orders and for which they had paid $190,675.50, and upon which he had put up by way of margin $44,169.15. Towards the end of August, the defendant was behind in his margin account about $11,000. He was repeatedly notified of this, and responded by de-positing $1,000 on the 12th of August and another $1,000 on the 21st of August. As the price of stocks was declining, the debit balance against him grew during the month of September until it reached about $17,000 on the 10th of October. He failed to respond to de-mands for more margin, and on said 10th of October Mr. Monzo had an interview with Mr. Mayer.

"Mr. Monzo stated that he had put up all the money that he had, that he could not put up any more, and begged me at the time to be lenient with him. I told him that the times were serious, the times were strained, and required everything. He told me that he had lost about $40,000, at which I told him I was very, very sorry, but the times were serious, and he must get me more money, but Mr. Monzo says he could not do it, but he says, 'Please don't sell me out, please carry my stocks for me.' I told him I must do the best I can, and I would do the best to carry his stocks as long as I could. That is all I could promise."

At 2:45 in the afternoon of October 22, 1907, the plaintiffs suspended, made a voluntary assignment for the benefit of creditors, and the following day, October 23d, were petitioned into bankruptcy, and a receiver was appointed by the United States District Court who immediately took charge. At that time defendant owed the plaintiffs $173,918.35. But the receiver obtained possession of none of the stocks in suit, took no action in regard to them, and made no demands upon the defendant. The 1,900 shares of stock had been pledged by the plaintiffs with various banks and financial institutions as security for loans, and on the 23d of October said banks, without notice to defendant, sold said shares at the market for $132,700.25. Crediting the amount thereof and certain dividends, plaintiffs claim as a balance due on the account $39,843.10 with interest.

The relation of stockbroker and customer is tolerably well fixed in the law and is succinctly stated by Mr. Justice Williams in Douglas v. Carpenter, 17 App. Div. 329, 45 N. Y. Supp. 219, as follows:

"The relation of pledgor and pledgee existed between the defendant and the plaintiffs. The securities are the property of the defendant, and the plaintiffs had a lien thereon for the amount of their advances. The unauthorized sale of the securities by the plaintiffs would have been a conversion thereof. An unauthorized loan of the securities by the plaintiffs, with the understanding that the person borrowing them might sell or dispose of them according to their pleasure, would have been a conversion thereof. Such sale or loan would not have been consistent with the general ownership and ultimate rights of the defendant. * * * The defendant had the ownership of the securities, but not the right of possession. His interest in the property consisted in his right of redemption. By payment or tender of the indebtedness the lien of the plaintiffs would have been discharged, and the defendant would have become entitled to the immediate restoration of his property. The plaintiffs might take title to the securities in their own name, and were not bound to retain or deliver the identical securities purchased for the defendant. Their duty was to keep on hand, or under their control, either the securities of the defendant or a like kind and amount of securities, and to have them in such situation that the defendant, by paying the amount due by him thereon, could, at any time, obtain them. This was what the plaintiffs agreed to do, and, so long as they did this, the fact that they used the securities while in their possession, awaiting redemption by the defendant, would not amount to a conversion thereof. See Markham v. Jaudon, 41 N. Y. 235; Baker v. Drake, 66 N. Y. 522 [23 Am. Rep. 80]; Gruman v. Smith, 81 N. Y. 28; Lawrence v. Maxwell, 53 N. Y. 19; Capron v. Thompson, 86 N. Y. 418; Taussig v. Hart, 58 N. Y. 429; Caswell v. Putnam, 120 N. Y. 153 [24 N. E. 287]; Hopper v. Sage, 112 N. Y. 535 [20 N. E. 350, 8 Am. St. Rep. 771]; Horton v. Morgan, 19 N. Y. 170 [75 Am. Dec. 311]; Stewart v. Drake, 46 N. Y. 449; Levy v. Loeb, 85 N. Y. 365."

But the right of hypothecation depends upon the fact that the broker has on hand *or under his control* either securities of the cus-

tomer or a like kind and. amount of securities. Do the facts in the case at bar establish that the plaintiffs conformed to that requirement?

In Douglas v. Carpenter, supra, the action was brought by a firm of bankers and stockbrokers, members of the Stock Exchange in New York City, to recover the balance of an account growing out of speculative stock, bond, and grain operations conducted by plaintiffs for defendant on margin. The account began October 11, 1888, and continued until December 1, 1893. The defendant claimed that there had been conversion by the plaintiffs of certain securities belonging to the defendant by their having pledged the same, and that the defendant was entitled to damages for such conversion. The court stated the question as follows:

"Were the plaintiffs guilty of a conversion of the defendant's securities by pledging them for the benefit of the plaintiffs' own business, mingling them with other securities, and obtaining loans thereon for a greater amount than the indebtedness of the defendant to the plaintiffs on account thereof, and without retaining in the plaintiffs' possession other securities of a like kind and amount? * * * It is not doubted but that the plaintiffs might lawfully have pledged the defendant's securities, by themselves, separate and apart from others, for an amount not exceeding the indebtedness to them by the defendant thereon. In such case the defendant would have been protected, because he could have gone to the pledgees and have obtained the securities by payment or tender of the amount of his indebtedness and nothing more (Chapman v. Brooks, 31 N. Y. 75); but mingling them with other securities and pledging them for an amount larger than the defendant's indebtedness would have placed them where the defendant could not have obtained them by a payment or tender of the amount of his indebtedness, and would have been illegal and unauthorized. McNeil v. Tenth National Bank, 46 N. Y. 325 [7 Am. Rep. 341]; Schouler on Bailments (1st Ed.) 201. It will not do to say that plaintiffs *might* be able to get defendant's securities released from the pledges made by them, by paying up the whole or a part of the amount for which the pledges were made, and so be able to surrender them to defendant on payment or tender of the amount of his indebtedness. His doing this, like his purchasing other securities in the case of a sale or loan already referred to, would be dependent upon his having the funds to pay the amounts for which the pledges had been made or upon his ability to get such securities released, and the same reasoning is applicable to pledges as would apply to sales or loans under like circumstances. * * * If such pledges had been made, and the plaintiffs had absconded or become entirely insolvent, the defendant would not have been able to get possession of his securities by merely paying the indebtedness thereon by himself to the plaintiffs. We are unable in any view of the case to see how the pledges of the defendant's securities could be said to have been legal. It seems to us that they were illegal and were conversions of such securities."

Rothschild v. Allen, 90 App. Div. 233, 86 N. Y. Supp. 42, affirmed 180 N. Y. 561, 73 N. E. 1132, was an action to recover damages against a firm of stockbrokers for conversion of certain stocks bought upon margin. The defendants pledged the stocks with three different financial institutions for loans to them. The defendants' firm suspended business, and on the same day the pledgees of the stock sold the same and appropriated the money therefor to reimburse them for loans which they had made to the defendants. No notice of the time and place of the sale was given to the customer, nor was he given a reasonable opportunity to protect his interest by further margins, if such act upon his part would have prevailed to prevent a sale.

Having learned of the suspension, the customer went to the office of the defendants, demanded his stocks, and was informed that the firm had suspended business and that they could not make delivery of the same. Mr. Justice Hatch, writing for the Appellate Division in this department, said:

"While, therefore, the defendants herein had authority to pledge the securities to secure loans to them, yet they were bound in making use of the securities to at all times during the life of the transaction keep themselves in readiness to deliver such securities or an equivalent number of the same kind of shares to Frank whenever he should offer to pay the unpaid portion of the purchase price. If the stocks were so pledged that delivery from the pledgee could be had when demanded by Frank upon payment by him of the unpaid purchase price, it would answer the obligation assumed by the broker, even though he did not have other shares of the same stock upon hand to deliver, as all Frank was entitled to was the delivery of the shares to which he was entitled upon payment, and, if he could obtain them by payment, conversion of the stock by the broker could not be predicated of the transaction. * * * When they pledged the stock to secure their own loans, they did so at the peril of being able to deliver the same if delivery was demanded by the owner and he tendered payment. They were not authorized to pledge it, except upon that condition. It was their act which placed it beyond their power to deliver this stock or its equivalent when Frank made demand upon them so to do. When that demand was made, they were without ability to perform, and, as they had not complied with the conditions which alone gave them the right to pledge the stock, the resultant sale of the same became by operation of law their act, and such act was as to them, and between them and Frank, a conversion of his property."

In Strickland v. Magoun, 119 App. Div. 113, 104 N. Y. Supp. 425, affirmed 190 N. Y. 545, 83 N. E. 1132, on opinion below: On October 17, 1901, Magoun Bros. & Co., stockbrokers, had purchased on margin for one Kidder 100 shares of stock. On November 29, 1902, the firm had rendered him a statement showing a balance due to them of $444.80 and that they held the said 100 shares of rubber stock as collateral security therefor. Prior to December 16, 1902, the brokers had hypothecated these shares, purchased on Kidder's account, with a large amount of other securities as collateral security for a call loan to them of $120,000. The firm did not have under its name or under its control ready for delivery the shares of stock purchased for Kidder, nor an equal amount of other shares of said stock. It has never had since that date. On October 20, 1905, Kidder tendered the balance due on his account and demanded the delivery of the stock, which was refused. This action was brought for conversion. The court said:

"If the broker, for his own benefit, mingles his customer's stock with other securities and rehypothecates them for a greater amount than the amount of the customer's indebtedness to him, not having under his control a like amount of stock with which delivery can be made if demanded, it is an unauthorized loan, and he is guilty of conversion. Douglas v. Carpenter, 17 App. Div. 329 [45 N. Y. Supp. 219]; Rothschild v. Allen, 90 App. Div. 233 [86 N. Y. Supp. 42]. * * * As between the plaintiff and the defendants Magoun and Van Duzer, the date of conversion was October 20, 1905, * * * the date of the demand upon them, and their refusal to deliver the stocks. I deem the 20th of November, 1905, a reasonable time to allow the plaintiff to replace the stock. Between the 20th day of Oc-

tober, 1905, and the 20th day of November, 1905, the stock was quoted steadily at 57. The plaintiff is therefore entitled to judgment for $5,700 less $395, the amount remaining unpaid on the stock, with interest from the 20th day of November, 1905."

It seems to me that these three cases, two of which were affirmed by the Court of Appeals, establish the proposition that when a stockbroker, who has possession of stock purchased on margin for a customer, mingles that stock with other securities and hypothecates the mingled mass as security for a loan exceeding the amount of his customer's indebtedness to him, and has no other like stock of equal amount in his possession or under his control, the hypothecation is unlawful and constitutes a conversion, because the customer cannot redeem the same from the broker's pledgee upon tender of the amount due by him to the broker, and, within the meaning of the rule permitting rehypothecation, the broker has lost control of the pledged stock.

In the case at bar both sides moved for the direction of a verdict. The facts therefore were submitted, for the decision of the court and upon review are to be interpreted in favor of the respondent, and we are limited to the consideration of whether, upon such favorable interpretation, there is any evidence to support the judgment.

It is conceded that no notice was ever given to the respondent that his stocks had been rehypothecated or with whom. It is conceded that no notice was given to him that they had been sold until the 3d of December, 1908. It is conceded that his stocks mingled with many others had been hypothecated to secure $6,500,000 of loans, and it is conceded that they were distributed among five or six institutions who advanced the loans, and that in each case the amounts of the loans, upon which respondent's stocks constituted part of the collateral, were far in excess of the amount of the indebtedness of the respondent to the appellants upon the purchase of those identical stocks, and it is conceded that all of the stocks purchased by the appellants belonged to their several customers, and that they did not have at any time during this transaction any free stock of like quantity and character of that belonging to the respondent.

The defendant testified that upon three several occasions after the 22d of October, 1907, both before and after they resumed business he had interviews with the appellants at which he was told that his stocks were all right, that his account was all right, and in no one of which was there any intimation conveyed to him that they had been sold.

It is true that the proof does not show that he ever made a tender of the amount of the balance due by him, but in Briggs v. Jones, 8 Misc. Rep. 261, 28 N. Y. Supp. 709, affirmed on the opinion below 149 N. Y. 577, 43 N. E. 986, Bischoff, J., writing for the General Term of the Court of Common Pleas, said:

"Upon the undisputed evidence that the defendants had no stock of the same character subsequent to the conversion the conclusion that the plaintiff's cause of action was complete when such conversion took place, without a demand, rests upon unquestioned authority. Ganley v. Bank, 98 N. Y. 487, 493," and cases cited.

137 N.Y.S.—40

The plaintiffs' answer to this claim of conversion is that the sale was not made by them; that they could neither prevent it nor give notice of it; that by being thrown into bankruptcy by the filing of the petition, the appointment of the receiver, and the subsequent adjudication, they became civilly dead; that they had in good faith performed their agreement with the defendant not to sell out his stocks, but to carry them as long as they could; that that period had been reached when they went into bankruptcy; that the inevitable result of that act was the sale of the stocks; that if they had been in their actual physical possession they would have been sold by the receiver; that, being in the hands of their pledgees, they were sold by them; that the failure and the bankruptcy were public acts, published in the newspapers and a matter of record, of which the defendant was bound to take notice, and of which he did have actual notice; that the stocks when sold were sold at their market value, and the amount realized on the sale credited upon their account with the defendant in full; that their bankruptcy put an end eo instante and ipso facto, to this venture; that the mutual obligations became fixed as of that time; that such a thing as the continuance of the transaction was legally impossible; that the speculation, which depended upon the ability of the plaintiffs to carry the stock in order that the defendant might have a chance to make speculative profits, was destroyed by the act of bankruptcy.

It seems to me that the whole argument built upon the bankruptcy proceeding, while ingenious, is nevertheless fallacious. If I am right in the conclusion that by the unlawful hypothecation the appellants had converted the respondent's stock, then at the time of the bankruptcy proceeding he was a creditor. No schedules were ever filed, and no discharge in bankruptcy ever issued. The petition was dismissed and the proceedings in bankruptcy discontinued. The plaintiffs are not discharged bankrupts, but are stockbrokers, reinstated on the Exchange and continuing in business after a brief period of suspension. They are subject to all their pre-existing liabilities, except where settled or compromised, as if no interruption of their enterprise had intervened. They are suing this defendant upon that basis. If their claim against the defendant survives the inconclusive bankruptcy proceeding, his counterclaim must likewise survive. They made no move to institute proceedings to collect their alleged claim until after the defendant had discovered the sale of his stocks, had disaffirmed said sale, and had demanded damages. The controversy is not between a bankrupt estate and a customer. There is no bankrupt estate. The receiver did not sell the stocks. They were the property of the defendant upon which plaintiffs had a lien. They were improperly and unlawfully mingled with other stocks and rehypothecated. They were sold without notice by the pledgees, not by virtue of any bankruptcy proceedings, but by virtue of the powers conferred upon the pledgees by the plaintiffs.

I can find nothing in these proceedings which affects the claim of the respondent upon the facts as they appear in this case. The numerous decisions cited by the learned counsel for the appellants were

made in cases of real bankruptcy where questions arose affecting the bankrupt estate. They have no application here.

As the verdict was directed, after motion by both sides, there is no dispute about the value of the stocks at the dates taken or the several computations.

The judgment and order appealed from should be affirmed, with costs and disbursements to the respondent.