In re SALMON WEED & CO., Inc.

SCHEUER et al. v. SALMON WEED & CO.,
Inc., et al.

No. 154.

Circuit Court of Appeals, Second Circuit.
Aug. 4, 1931.
On Rehearing Nov. 16, 1931.

Garey & Garey and Garey, Crowley & Beatty, all of New York City (Edward K. Kennedy, of New York City, of counsel), for appellants.

Cravath, deGersdorff, Swaine & Wood, of New York City (Bruce Bromley, of New York City, of counsel), for appellee Irving Trust Co.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The alleged bankrupt, Salmon Weed & Co., was a corporation engaged in the business of dealing in securities, but was not a member of any stock exchange. A. L. Scheuer & Co. were stockbrokers and members of the New York Stock Exchange. They were instructed by the alleged bankrupt to clear for it certain transactions in sales of stock of the Chemical Bank & Trust Company, and accordingly purchased such stock for the account of their customer with their own funds. Thereafter, and on July 5, 1929, an involuntary petition in bankruptcy was filed against Salmon Weed & Co., and on July 8, 1929, Irving Trust Company was appointed receiver in bankruptcy of its property. Two hundred shares of Chemical Bank stock were on hand at the date of the filing of the petition which have never been taken up or liquidated, and the debit balance of Salmon Weed & Co. against those shares of stock was $28,631.52 at that date. In the schedules filed by the alleged bankrupt, for the purpose of a composition, the stock was listed at the value of $26,400. A. L. Scheuer & Co. had pledged the stock, without obtaining any consent from Salmon Weed & Co., in a bank loan which they were carrying in the amount of $100,000. It is not shown just when this repledge was made.

On September 23, 1929, a representative of the receiver instructed the brokers to sell the stock because it had advanced in price. The brokers requested written instructions, perhaps in fear of the clause of the receivership order enjoining all persons from disposing of property of the alleged bankrupt; but, whatever may have been the motive, the receiver acquiesced in the request and wrote a letter to A. L. Scheuer & Co., which they say never reached them. This letter admittedly only suggested that the brokers sell 200 shares of Chemical Bank & Trust Company stock, held for the account of Salmon Weed & Co., if they "should care to do so." From this it is evident that there were no definitive instructions by the receiver to sell the stock and that the whole matter of sale was left within the discretion of the brokers.

On October 11, 1929, the alleged bankrupt filed schedules, and on October 14 filed terms of composition with the referee. The latter thereupon directed A. L. Scheuer & Co. to prove their claim. Upon the hearing, he decided that the repledge of the stock by the brokers was an unlawful conversion and apparently also that the damage due to the conversion was sufficient to set off the brokers' claim, which was accordingly expunged. The judge, on review, arrived at the same result, not, however, on the ground of conversion, but because the brokers should have sold the security more promptly, at least in September, 1929, when its value exceeded the amount of the loan. In reaching this conclusion, the judge laid stress on what he termed the well-established practice of the New York Stock Exchange to close out transactions like those here " 'under the rule' immediately after bankruptcy."

Counsel for the receiver attempts to sustain the disposition of the case below on the ground that:

(1) The brokers should have liquidated the security promptly so that it would have had sufficient value to satisfy their claim.

(2) If they were not obliged under their contract to sell more promptly, yet, as they might have done so, the court could in this litigation determine the value of the security, and has done this correctly.

(3) The repledge was an unlawful conversion, and the proper measure of damages for it exceeded the amount of the claim.

(4) The expunging of the claim of A. L. Scheuer, followed by the confirmation of the composition and the distribution of the composition fund to the other creditors, renders this appeal applicable only to moot questions, and it should accordingly be dismissed.

The first two points cannot, in our opinion, be sustained. Sections 57e and 57h of the Bankruptcy Act, 11 USCA § 93(e, h) prescribe the methods whereby secured creditors may establish the amount of their claims. Section 57e provides that the claims of such creditors shall be allowed for such sums only as to the courts seem to be owing over and above the value of their securities. Section 57h prescribes two ways of fixing the value of the securities to be charged against

the face of a secured claim. The first is by converting the security into money according to the terms of the agreement whereby it was delivered to the creditor; the second way is by "agreement, arbitration, compromise, or litigation, as the court may direct." We know of no basis for holding that a pledgee must sell his security immediately after the pledgor has become bankrupt. To be sure such was apparently the decision of a majority of the Appellate Term of the New York Supreme Court in Steinhardt v. National Park Bank, 52 Misc. Rep. 464, 102 N. Y. S. 546. There the sale was made seventeen months after bankruptcy. When the petition was filed, the security was worth enough to cover the claim. When it was sold, the proceeds were very much less. The majority of the court held that in such a situation the creditor had no balance over and above the value of the security which could be set off against debts of the creditor to the bankrupt estate. But the Appellate Division reversed this decision (Steinhardt v. National Park Bank, 120 App. Div. 255, 105 N. Y. S. 23) and fixed the amount of the creditors' claim as of the time when the security was sold. We have apparently laid down the same rule in Re Isaacs, 246 F. 820. No proof was offered showing any term of the agreement under which the 200 shares of stock were held requiring a sale in the event of the bankruptcy of the pledgee or at any particular time, and, indeed, so far as the proof goes, the time of sale was left by the receiver to the discretion of the pledgee.

█ If, in the circumstances, the brokers here waited too long, it was open to the receiver to apply to the court and obtain an order requiring them to liquidate under section 57h of the Bankruptcy Act, 11 USCA § 93(h). This the receiver made no attempt to do.

It seems quite unreasonable to require a pledgee, as a matter of law, to sell as soon as a petition in bankruptcy is filed. In the first place an adjudication may not follow, and, in any event, either the alleged bankrupt or, if he is adjudicated, his receiver or trustee, may wish to pay the debt and acquire the pledge rather than have it sold in the market if its intrinsic worth is substantial and the market is so narrow as to make a good sale unlikely. Section 57h of the Bankruptcy Act guards against too great delay in liquidation by allowing an application to the court if liquidation is not effected in some of the other ways provided by the section.

██ The court below speaks about "closing out under the rule." Perhaps only a common practice of brokers is referred to, but, if so, no such practice was proved, and it would certainly have to have the strength of a general custom to be read into the agreement. Nor was any rule established. The only rule even mentioned in the briefs is an unproved rule of the New York Stock Exchange (section 1, chapter 4) which provides in certain cases for closing out contracts between members of the Exchange, without unnecessary delay, in cases where the debtor member is suspended. We cannot take judicial notice of the rules of the Exchange. Moreover, the debtor, Salmon Weed & Co., was not a member. Likewise we are unaware whether such a rule would apply to a case where, as here, the debtor, or his legal representative, left it to the creditor to sell if he "should care to do so." Accordingly the brokers, who have never liquidated their claims, may liquidate them still and prove for the balance unless, by reason of their conversion of the securities, they are liable to the alleged bankrupt for at least an equal amount.

██ The question whether a pledgee who repledges for a greater amount than his own loan is liable ipso facto in trover or detinue is one over which legal battles have been fought for many years. It is certainly hard to see why such a repledge is not an exercise of dominion over the pledgor's property, so inconsistent with his rights as to amount to a conversion and to justify such actions. The pledgee has used the property as though it were his own and has subjected the pledgor's interest to an added risk. Yet in England it seems to be settled that such an act is not in itself a conversion and that trover will not lie without a demand and tender of the amount of the original loan and a failure to surrender the pledge. Donald v. Suckling, L. R. 1 Q. B. 585; Halliday v. Holgate, L. R. 3 Ex. 299.

It is difficult to explain why a pledgor may not recover in trover without tender and demand, when there is a wrongful rehypothecation, while he may generally bring trover in case of an unlawful sale of property, subject to a lien or pledge, without the performance of any such condition. Content v. Banner, 184 N. Y. 121, 76 N. E. 913, 6 Ann. Cas. 106; Wilson v. Little, 2 N. Y. 443, 51 Am. Dec. 307; Stearns v. Marsh, 4 Denio (N. Y.) 227, 47 Am. Dec. 248; Feige v. Burt, 118 Mich. 243, 77 N. W. 928, 74 Am. St. Rep. 390; Baltimore Marine Ins. Co. v. Dalrymple, 25 Md. 269; Waring v. Gaskill, 95 Ga. 731, 22 S. E. 659. See, also, Legg v. Evans, 6 M. & W. 40.

One cannot see a substantial difference in the risk to the customer whether the broker re-sells the security or repledges it in a large bank loan. In either event the broker may be able to get equivalent shares of stock for delivery—in the one case by purchase in the market, and in the other by paying off enough of his bank loan to withdraw the stock. But in neither case would he hold shares certainly available for delivery.

No one can say that a repledge for a greater amount than the original loan, without the authority of the pledgor, is not at least a breach of contract. So it was regarded in Donald v. Suckling, and Judge Cardozo said in Wood v. Fisk, 215 N. Y. at page 238, 109 N. E. 177, that it was certainly that. In Donald v. Suckling, Cockburn, C. J., speaking of such a repledge, said that it did not "put an end to the contract altogether, so as to entitle the pawnor to have back the thing pledged without payment of the debt." Donald v. Suckling, as well as Halliday v. Holgate, rested mainly on the ground that a pledgee has such a special property in the pledge that actions, essentially possessory, will not lie for breaches of the contract without a precedent tender of the debt to the pledgee and failure on his part to surrender the pledge.

While Donald v. Suckling and Halliday v. Holgate, supra, have to some extent been followed in this country, they have on the whole been disapproved and have been much criticized. The courts in Pennsylvania have flatly held to the contrary. Sproul v. Sloan, 241 Pa. 284, 88 A. 501, Ann. Cas. 1915B, 941; Darr v. Fidelity Title & Trust Co., 243 Pa. 591, 90 A. 368; Sterling's Estate, 254 Pa. 155, 98 A. 771. There a sale or repledge for a sum in excess of the original loan is a conversion, and no tender is necessary before bringing an action in trover.

The Supreme Court of Minnesota in King Cattle Co. v. Joseph, 158 Minn. 481, 198 N. W. 798, 199 N. W. 437, held that a repledge was a conversion and that the pledgor could recover the securities from a subpledgee who had taken with notice. A decision of the Supreme Court of Washington is to the same general effect. Vance Lumber Co. v. Fraser Goodwin & Colver, 298 P. 438.

The New York decisions are in some confusion. In Douglas v. Carpenter, 17 App. Div. 329, 45 N. Y. S. 219, the Appellate Division, First Department, held by a divided court that a stockbroker who repledged his customer's securities for a sum greater than his indebtedness was liable in conversion and that no demand and tender were necessary. By a later decision of the Appellate Division, in the same department, also rendered by a divided court, an exactly opposite result was reached. Mayer v. Monzo, 151 App. Div. 866, 137 N. Y. S. 616. Rogers v. Thomson, 215 App. Div. 541, 214 N. Y. S. 193, is another decision of the First Department to the same effect as Mayer v. Monzo, supra. Heaphy v. Kerr, 190 App. Div. 810, 180 N. Y. S. 542, is a later decision of the Appellate Division, Third Department, holding a repledge for an excessive amount a conversion. Whether a demand and tender are necessary before an excessive repledge can be regarded as a conversion has not been decided by the New York Court of Appeals. In Wood v. Fisk, 215 N. Y. 233, 109 N. E. 177, 178, Judge Cardozo discussed the question. He said that a repledge of securities for an amount in excess of the original loan "may have constituted a conversion," but, in any event, was "a breach of contract." That is as far as the Court of Appeals has gone. The wrong arising out of such a breach of contract would be a violation of the implied promise to hold the securities only for the purpose of the contract of pledge. But if the shares of stock were returned there would ordinarily be no substantial damages for the breach. Accordingly the important question in the present case is whether a repledge for an excess amount in itself constitutes a conversion. While the Appellate Divisions have uttered discordant notes and the Court of Appeals has not yet spoken on this precise question, American courts in general, and the New York courts in particular, have been almost unanimous in holding that a sale by a pledgee contrary to the terms of the agreement is a conversion and that trover will lie without a tender or demand. In reason the same rule should apply to a repledge for an excessive amount. This is not the law in England where a demand and tender must be made not only against a subpledge (Donald v. Suckling), but likewise against the pledgee himself even when he has unlawfully sold the pawn. Halliday v. Holgate, L. R. 3 Ex. 299.

In Talty v. Freedman's Savings Bank & Trust Co., 93 U. S. 321, 23 L. Ed. 886, Talty borrowed money from Kendig, who took as security for the loan certificates of the District of Columbia indorsed by Talty in blank. Kendig thereafter, without authority from Talty, sold the certificates to the defendant, a bona fide purchaser, who had no notice of

Talty's rights. The Supreme Court held that Talty, the pledgor, could not recover against the purchaser of the certificates without first tendering the amount due on the pledge. Donald v. Suckling, was cited and apparently relied on. The court suggested that the defendant had perhaps acquired complete title to the certificates by estoppel, and referred to McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341, where it was decided that a person who had clothed a broker with apparent title to stock by indorsing the certificates in blank and delivering them to him as security was precluded as against a bona fide purchaser or lender from questioning the broker's right to sell or repledge. In the Talty Case the Supreme Court did not defeat the plaintiff because he had transferred to his agent documents indorsed in blank for use for certain purposes, and the defendant, a third party who had innocently advanced money on the faith of the agent's apparent authority, ought not to suffer, but rested their decision on the failure of the pledgor to make a tender. They did this because, as they said, the other point had "not been argued." Yet they were dealing only with the rights of an innocent third party and as that party in the Talty Case had a clear defense on the merits (National Safe Deposit Co. v. Hibbs, 229 U. S. 391, 33 S. Ct. 818, 57 L. Ed. 1241), it may be doubted whether the reasoning of that decision would be followed by the Supreme Court even as to causes of action between a pledgor and an innocent subpledgee or vendee. But, in any event, the issue was only between pledgor and vendee of the pledgee, and it is a long step from a decision in such circumstances to the extreme doctrine of Halliday v. Holgate, 3 Ex. 299, that requires a tender where the action is against the pledgee himself, who has wrongfully sold the pawn. The idea that a pledgee has such a special kind of property in the pledge that nothing he may do can subject him to an action for conversion, unless a demand and tender have been made, originated wholly in the English decisions in the 1860's. Donald v. Suckling required such a tender before allowing trover against an innocent subpledgee, and Halliday v. Holgate supplemented this by requiring a tender before allowing it even against the original pledgee who had wrongfully sold the pawn. All, or at least almost all, the American authorities are against the doctrine of Halliday v. Holgate (Farrar v. Paine, 173 Mass. 58, 53 N. E. 146; Rush v. First National Bank [C. C. A.] 71 F. 102; Dibert v. Wer-

nicke [C. C. A.] 214 F. at page 683), and many of them treat an excessive repledge as a conversion, or the equivalent of a tortious resale. In principle we can see no practical difference between the two wrongs.

There is a special reason for treating a repledge for an amount greater than the original loan as a conversion where as in New York there is a statute (Penal Law N. Y. § 956) making such an act a felony if the broker shall cause his customer loss because of inability to deliver the latter's stock. In Wood v. Fisk, supra, Judge Cardozo suggested that this penal statute might affect the dischargeability in bankruptcy of claims for conversion arising from unlawful repledges which had accrued after the passage of the act. Such claims were afterward held nondischargeable in Heaphy v. Kerr, 190 App. Div. 810, 180 N. Y. S. 542, affirmed 232 N. Y. 526, 134 N. E. 557. Certainly the legislative policy as to rehypothecation by a broker of a customer's stock to secure amounts in excess of his own advances is very clear. Unless consent of the customer is obtained, the transaction is undoubtedly illegal, and if loss ensues it is a felony. How can it be said that it is not a conversion?

There is another reason for holding that a repledge for an amount in excess of the original loan is a conversion. If such a repledge is only a conversion where there is a financial inability to make a tender, a wrongful repledge will rarely affect a solvent broker. He can go merrily on in fair weather using his customers' stocks as capital in his business, whereas when storms arise such unlawful repledges are certain to cause losses to creditors who have given no authority to repledge their stocks beyond the amounts of their own indebtedness. In other words, to impose no liability upon a broker for such unauthorized acts tempts him to risk his customers' property in good times for his own advantage and to make his customers bear his business losses if he becomes insolvent. The most practical way to check such wrongs is by treating brokers who have used their customers' securities without the latter's consent as converters. This on principle they certainly are.

■ There is nothing in the record to show when the repledge of the stock of Salmon Weed & Co. occurred or what was the value of the stock at the time the alleged bankrupt learned of the conversion. The damages for such a conversion are the highest intermediate value of the stock between the time of the conversion and a reasonable time after the

owner has received notice of it. Galligher v. Jones, 129 U. S. 193, 9 S. Ct. 335, 32 L. Ed. 658; Clements v. Mueller (C. C. A.) 41 F.(2d) 41; In re Swift (D. C.) 114 F. 947; Baker v. Drake, 53 N. Y. 211, 13 Am. Rep. 507; McIntyre v. Whitney, 139 App. Div. 557, 124 N. Y. S. 234. The pledgee is liable for these damages, but is entitled to recoupment to the extent of the amount due upon the loan. In re Kardos (C. C. A.) 27 F. (2d) 690; Farrar v. Paine, 173 Mass. 58, 53 N. E. 146. If this indebtedness should be greater than the damages recoverable for the conversion, A. L. Scheuer & Co. may prove their claim for the difference.

■ We have nothing before us to show the confirmation of the composition or a distribution of the fund. But, if the facts are correctly stated in the briefs, we can see nothing to prevent an order of the District Court requiring the bankrupt to deposit the requisite dividend to satisfy any claim that A. L. Scheuer & Co. may be able to prove. In re Everick Art Corp. (C. C. A.) 39 F.(2d) 765; In re Isidor Klein (C. C. A.) 22 F.(2d) 906; In re Watman, etc. (D. C.) 291 F. 886. Section 25a (3) of the Bankruptcy Act, 11 US CA § 48 (a) (3), clearly allows this appeal, and the contention that the questions raised by it are moot is without substance.

The order of the District Court is reversed, and the proceeding remanded, with directions to allow A. L. Scheuer & Co. to prove their claim, if they desire, in accordance with the principles indicated in this opinion.

### On Petition for Rehearing.

PER CURIAM.

In our original opinion we said that the damages to be recovered by the bankrupt estate were "the highest intermediate value of the stock between the time of the conversion and a reasonable time after the owner had received notice of it." In the briefs then before us there was no discussion of the authorities bearing upon the proper measure of damages. The rule which we adopted was thought to be required by the decision of the Supreme Court in Galigher v. Jones, 129 U. S. 193, 9 S. Ct. 335, 32 L. Ed. 658. It is true that the rule stated in our opinion is in accord with the language of the opinion in the Galigher Case, but a further consideration of that decision leads us to the conclusion that the language is not applicable to a situation where stock of a customer converted by a broker reached a higher price before the customer received notice, than it did within a reasonable time afterwards. In the Galigher Case a broker, on November 27 and 29, 1878, wrongfully sold 600 shares of "Challenge" stock belonging to a customer at $1.25 per share. In December the stock reached the price of $2 per share; in January $3.10; and in February $5.50. The customer was allowed to recover upon the basis of the price in January on the ground that he had then had a reasonable time after receiving notice of the sale within which to replace his stock. Apparently the stock was steadily rising and there was no time prior to notice of the sale when it was quoted at a higher figure than the January price. The court held that it was not enough to allow the customer the value of his stock at the time of conversion, and Justice Bradley, who wrote the opinion, said (129 U. S. at page 200, 9 S. Ct. 335, 337, 32 L. Ed. 658): "The effect would be to give to the broker the control of the stock, subject only to nominal damages. The real injury sustained by the principal consists not merely in the assumption of control over the stock, but in the sale of it at an unfavorable time, and for an unfavorable price."

In accordance with this view, the customer was allowed the highest value reached by the stock between notice of the wrongful conversion and a reasonable time thereafter. The Supreme Court referred to, and expressly adopted, the New York rule, citing Baker v. Drake, 53 N. Y. 211, 13 Am. Rep. 507; Gruman v. Smith, 81 N. Y. 25; Colt v. Owens, 90 N. Y. 368; and Wright v. Bank of the Metropolis, 110 N. Y. 237, 18 N. E. 79, 1 L. R. A. 289, 6 Am. St. Rep. 356.

In Baker v. Drake the broker had wrongfully sold out his customer. The trial court, following Markham v. Jaudon, 41 N. Y. 235, had instructed the jury that the customer was entitled to recover the difference between the amount for which the stock was sold and the highest market value which it reached at any time between such sale and the date of trial. But the New York Court of Appeals expressly overruled Markham v. Jaudon, and said that "the advance in the market price of the stock from the time of the sale up to a reasonable time to replace it, after * * * notice of the sale, would afford a complete indemnity." In Baker v. Drake there was not, as in the case at bar, a period prior to notice of the unlawful sale within which the stock reached a figure higher than at the time of conversion or than at any time subsequent to notice. Therefore, when Judge Rapallo said (53 N. Y. at page 217) that the

"advance in the market price of the stock from the time of the sale up to a reasonable time to replace it, after the plaintiff received notice of the sale, would afford a complete indemnity," the statement was entirely accurate as applied to the facts in Baker v. Drake. But as a statement of a general rule it was not accurate and was not followed in the subsequent New York cases. In Gruman v. Smith, 81 N. Y. 25, the Court of Appeals in stating the rule of damages said that the customer was entitled to a reasonable time after notice of the sale within which to replace the stock and "if in the meantime it had advanced in price * * * would have been entitled to the difference." Likewise in Wright v. Bank of Metropolis, 110 N. Y. 237, at page 249, 18 N. E. 79, 84, 1 L. R. A. 289, 6 Am. St. Rep. 356, the same court said that the customer was entitled "to the highest price reached within a reasonable time after the plaintiff has learned of the conversion of his stock within which he could go in the market and repurchase it."

In Mayer v. Monzo, 221 N. Y. 442, 117 N. E. 948, 950, Hiscock, C. J., reiterated the same rule, saying that "a person whose stocks have been converted is entitled to a reasonable time after notice of the conversion within which to determine whether he will purchase other stocks in the place thereof, and * * * may use as a basis for his claim of damages resulting from the conversion the highest prices which have prevailed during such reasonable period."

 It may be that in none of the New York cases we have cited the question whether the measure of damages was the highest price between the date of conversion and a reasonable time after the customer received notice, or the highest price within a reasonable time after notice, was necessarily involved. But the price within a reasonable time after notice has been stated by the Court of Appeals as the proper measure of damages and has been generally regarded as the New York rule (39 Harv. Law Rev. at page 124) except in cases where it is less than the value at the date of conversion. McIntyre v. Whitney, 139 App. Div. 557, 124 N. Y. S. 234, affirmed 201 N. Y. 526, 94 N. E. 1096. In other words, under the New York rule the measure of damages for conversion applicable in this situation is the market value of the stock at the time of the unauthorized hypothecation, or the market value within a reasonable time after notice of the hypothecation, whichever amount is the higher. Indeed, this is the very measure of damages proposed by the counsel for the appellees at the original argument as appears at page 18 of their brief.

In Burnham v. Lawson, 118 App. Div. 389, 103 N. Y. S. 482, 484, the precise question before us was decided by the New York Appellate Division, First Department, which reversed the trial court for allowing a plaintiff "to pick out the highest market price " * * at any time between the day of sale, and a reasonable length of time after receiving notice; whereas, the proper rule, as stated by the court in Wright v. Bank of the Metropolis, 110 N. Y. 237, 249, 18 N. E. 79, 1 L. R. A. 289, 6 Am. St. Rep. 356, is that 'the plaintiff is entitled to the highest price reached within a reasonable time after the plaintiff has learned of the conversion of the stock within which he could go into the market and repurchase it.' "

In McKinley v. Williams, 74 F. 94, the Circuit Court of Appeals for the Eighth Circuit allowed a principal the highest value which his stock reached between the date of conversion and a reasonable time after the owner had received notice, although the highest intermediate value was reached prior to notice of the agent's wrongful acts. But that decision, we think, was based on a too literal reading of the language of the Supreme Court in Galigher v. Jones, 129 U. S. 193, 9 S. Ct. 335, 32 L. Ed. 658; and an interpretation of Wright v. Bank of Metropolis, 110 N. Y. 237, 18 N. E. 79, 1 L. R. A. 289, 6 Am. St. Rep. 356, with which we cannot concur. A person whose property is converted may recover at least its value at the time of conversion. McIntyre v. Whitney, 139 App. Div. 557, 124 N. Y. S. 234, affirmed 201 N. Y. 526, 94 N. E. 1096; Hunt v. Boston, 183 Mass. 303, 67 N. E. 244. But where the property consists of fluctuating securities like stocks which have advanced in price since the date of notice of the conversion, this measure of damages is inadequate because insufficient to restore the owner to the position he would have been in but for the conversion. He should therefore be given a reasonable opportunity after he has received notice of the conversion to purchase similar securities in the market. If such securities sold for a higher price between the date of the conversion and the time when he received notice of the wrong than they did during a reasonable time after such notice, he ought not to recover this higher price for, if he had desired to dispose of them in that interval, he would have learned of the conversion. Inasmuch as he has shown no desire to realize any value

which his securities reached prior to notice of the conversion, he is given complete indemnity and put in the same position that he would have been in except for the conversion if he is allowed the market value of the stock at the time of the unauthorized hypothecation or the highest price between the date when he received notice of the conversion and a reasonable time within which he might have replaced his stocks after he learned of the wrong, whichever may be higher.

Our original opinion should be modified by allowing, as damages for the conversion, the market value of the stock at the time of the unauthorized hypothecation or the highest intermediate value of the -stock between *notice* of the conversion and a reasonable time thereafter whichever may be higher.